**ELBOW LAKE COOPERATIVE GRAIN COMPANY et al., Plaintiffs,**

v.

**COMMODITY CREDIT CORPORATION, Defendant.**

Civ. No. 1090.

United States District Court
D. Minnesota, Sixth Division.
June 12, 1956.

56

George E. MacKinnon, U. S. Atty., and Kenneth G. Owens, Asst. U. S. Atty., St. Paul, Minn., for defendant in support of said motion.

Herbert F. Horner, Gordon J. Berg, and William M. Thomson, Minneapolis, Minn., for plaintiffs in opposition thereto.

NORDBYE, Chief Judge.

The plaintiffs are grain warehousemen operating country grain elevators in Minnesota. They are engaged in buying grain from local farmers and reselling it at terminal markets, especially at Minneapolis and Duluth, Minnesota. They also store grain for the local farmers when the latter do not desire to sell their grain. These plaintiffs, so far as these proceedings are concerned, entered into Uniform Grain Storage Agreements with the Commodity Credit Corporation in 1953 and 1954. Under the terms of the contracts,

each plaintiff has received, stored, and loaded out defendant's flaxseed to be shipped to designated terminals via rail. The primary question presented in this litigation is whether defendant has properly determined the official grade of the flax so as to allow the plaintiffs the amount of credit to which they are entitled for the amount of flax which they delivered to the defendant. Briefly stated, plaintiffs contend that the quality and grade of defendant's flaxseed stored for, and delivered to, the defendant should be determined by the grade and dockage established by the so-called probe method of sampling the grain while still loaded in the boxcars instead of crediting plaintiffs with the grade and dockage under either the belt run or bin run methods of sampling. The plaintiffs contend that the belt or bin run method of sampling is contrary to the terms of the Uniform Grain Storage Agreement; that it violates Section 26.21 of the regulations of the Secretary of Agriculture under the United States Grain Standards Act; that therefore the sampling of the grain by such methods does not produce an official grade.

That there are no genuine issues of fact to be determined in this litigation seems indubitably clear in view of the uncontroverted facts. However, a somewhat complete recital of the admitted facts and their interpretation seems essential to an understanding of the conclusions of law to be deduced therefrom.

The salient provisions of the Uniform Grain Storage Agreement between the various plaintiffs and the defendant which should be considered first are as follows:

"12. Determination of Weights and Grades on Load Out—The class, grade, quality and quantity of all the grain loaded out by the warehouseman, whether stored, handled only, or direct transferred, and whether commingled or identity preserved, shall be determined on the basis of official weights and grades at the warehouse location, or if official weights or grades are not available at such point, on the basis of official weights and/or grades at destination or at the inspection point shown on the shipping order furnished the warehouseman, which, unless otherwise agreed, shall be the customary location on the route of shipment of an inspector licensed under the U. S. Grain Standards Act. Such inspection shall be for the account of Commodity. In the event either party calls for a federal appeal inspection,[1] such inspection shall be final and the expense thereof shall be for the account of the party requesting the appeal."

"19. Definitions—  *  *  *

"(e) Official Grades—Grades and grading factors established by an inspector licensed under the U. S. Grain Standards Act in accordance with the Official Grain Standards of the United States and protein content established by recognized protein laboratory."

It is apparent that the parties intended to have a settlement between them as to grade, quality and quantity of the grain delivered to Commodity determined upon the basis of official weights and grades either at (a) the warehouse location; (b) at the inspection point shown on the shipping order furnished the warehouseman; or (c) at destination. No official grades were available at any of the warehouses and no intermediate points were designated upon the shipping orders furnished by the defendant to the plaintiffs. Consequently, recourse must be made to the circular letter sent to each warehouseman by the defendant which determined the place and character of inspection for grade and quality. On June 2, 1953, defendant sent to each plaintiff Circular Letter No. 42 informing them that as to all "heavily loaded cars" which were so loaded by the warehousemen as to make it

---

1. The Uniform Grain Standards Act, Commodity Credit Corporation form 25 (revised 5–1–52) uses the word "reinspection" rather than "inspection."

impractical for the grain sampler to reach the bottom of the car with a standard five-foot probe, settlement would be made upon the basis of the official belt run grade. Apparently because of some question as to the efficacy of the so-called probe method of sampling grain while still in the cars by reason of unevenly loaded grain therein, it was determined by Commodity that resort should be had to the belt run method of determining the quality and grade of the grain in all cases. Hence, on May 10, 1954, defendant sent to each of the plaintiff grain warehousemen Circular Letter No. 59, which superseded No. 42, supra. This letter states that on all cars of grain unloaded by the warehousemen into cars for shipment going into storage, the grain therein would be belt run and settlement should be upon the basis of the official belt run. On May 26, 1954, an amendment of Circular Letter No. 59 was sent to each of the plaintiffs, notifying each of them that, to facilitate sampling each of the cars going into storage, the grain would be belt run and federal appeal would be called on the belt run grade so made. And furthermore, that settlement with the warehousemen as to grade or quality was to be based upon the federal appeal grade. It appears that, as to each of the cars involved herein, there were three determinations of grade and quality. First, grain inspectors of the State of Minnesota and licensed as federal inspectors, made probe tests of the grain in the cars before unloading and before the cars had reached the terminal to which they were sent. The bin or belt run samples upon which determinations of grade and quality were based were taken at the destination as the cars were being unloaded at and into the terminal elevators. They were made at designated places within the terminal elevators, and apparently the samples of grain upon which the second and third grade determinations were made were taken substantially at the same time with both a state and federal inspector present. In any event, the federal appeal referred to in the amendment to Circular Letter No. 59 was called on

the second determination of grade and quality; that is, the appeal was taken from the grade determination based on the first belt or bin run sampling. Federal appeal grade certificates were issued in compliance with the regulations and copies were mailed to each of the plaintiffs. At no time did any of the plaintiffs file objection, as they could under Sections 26.62 and 26.63 of the regulations, to the grade shown on the federal appeal grade certificate which was issued by the grain supervisor entertaining the appeal. Had such objections been filed, the regulations provide for a complete re-examination of the grain samples and all other evidence by a Board of Grain Supervisors to determine the grade of the grain. Nor was oral hearing on the matter ever requested under Section 26.55 of the regulations.

Plaintiffs contend first that the contract requires settlement as to the amount of credit to be allowed them for the grain loaded out upon the basis of the grade and dockage of the grain as this was determined from samples taken directly from the car at the warehouse, or at the earliest subsequent transportation point where official grading is available. Therefore, they contend that settlement in each of the transactions involved herein should have been made on the basis of the grades determined from the samples taken by means of the probe method of sampling because these samples were taken before the flax was unloaded from the boxcars, and were taken at the earliest possible opportunity subsequent to the departure of the flax from the plaintiffs' warehouses. The Court believes that there is no merit to plaintiffs' contention.

Each of the plaintiffs was notified that settlements as to each of the cars of flax shipped after May 26, 1954, would be belt run, and settlement would be based upon the federal appeal grade. The defendant did not designate any intermediate inspection point so it must follow that the settlement under the contract was to be made at "destination of the various cars of flax." The pertinent pro-

visions of the contract between the parties provide that, if official weights or grades are not available at the warehouse locations, then the class, grade, quality and quantity of all the grain loaded out is to be determined upon the basis of "official weights and/or grades at destination or at the inspection point shown on the shipping order furnished the warehouseman which, unless otherwise agreed, shall be the customary location of an inspector licensed under the United States Grain Standards Act." The word "destination" has no connotation which would suggest that the sampling of the grain should be taken either before or after the cars were unloaded. Moreover, it seems clear that the destination of this grain was the terminal warehouses where the grain was to be stored and not some railroad hold point whether such hold point was at the city where the terminal warehouse was located or at some point before the car had reached that terminus. Each of the loading orders issued to plaintiffs state on their face,

> "Billing destination: bill cars on straight bill of lading to destination shown."

> "Settlement weights and grades: unload weights and grades will be used for settlement purposes irrespective of billing destination shown above."

The loading orders make it quite clear on their face, therefore, that the billing destination is not to be considered as "destination" for the purpose of determining the official weight and grade of the flax for settlement. The "destination" intended under the contract is the point at which the flax has reached the end of its journey and is to be unloaded. The destination is the terminal warehouse as to each of these carloads of grain, and it should be pointed out that it was at this "destination" where the second and third grade determinations were made, and they establish the official grade of the flax under the contract. All of the sampling taken by the bin or belt run methods was performed by licensed federal inspectors or state inspectors licensed under the Act so there is no question as to their official status.

But even if the contract is construed as the Court has construed it above, plaintiffs challenge the right of defendant to predicate any appeal from a belt or bin run sampling of this flax. They contend (a) that this method of sampling was not authorized under the regulations which govern the inspections which are to be made by grain inspectors under the United States Grain Standards Act, 7 U.S.C.A. § 71 et seq.; (b) that the method of taking the appeal was not proper or authorized because it was taken before the grade determination from which it was appealing had been made; (c) that it was taken after the grain had lost its identity; and (d) that the Secretary of Agriculture lacked jurisdiction to make this inspection because the flax involved was not in interstate or foreign commerce.

The question as to whether defendant has complied with the contracts of the plaintiffs in making the settlement upon which it relies herein depends upon whether the federal appeal inspection was made in compliance with the United States Grain Standards Act. The language of the contract between the parties provides that the quality and grade of all grain loaded out by the plaintiffs shall depend upon the basis of "official weights and grades at places designated in the contract." And that "official grades" is to mean "grades and grading factors established by an inspector licensed under the United States Grain Standards Act in accordance with the official grain standards of the United States and protein content established by a regular protein laboratory." The contract further provides that, if either party calls for a federal appeal inspection, that inspection shall be final as to the official grade. It seems clear, therefore, that the parties intended to utilize the grade determination made under the United States Grain Standards Act as the basis for determining the grade and quality of this grain for the purpose of settlement under the contract. The relevant portions of the

United States Grain Standards Act are set forth in Footnote 2.[2] The relevant regulations issued by the Secretary of Agriculture under the authority of that act are set forth in Footnote 3.[3]

The Court is confronted at the threshold by findings of the Secretary of Agriculture as to the true grade of the grain, compliance with the statutory requirements for taking an appeal, and the

2. 7 U.S.C.A. § 78. "Whenever standards shall have been fixed and established under this chapter for any grain and any quantity of such grain sold, offered for sale, or consigned for sale, or which has been shipped, or delivered for shipment in interstate or foreign commerce shall have been inspected and a dispute arises as to whether the grade as determined by such inspection of any such grain in fact conforms to the standard of the specified grade, any interested party may, either with or without reinspection, appeal the question to the Secretary of Agriculture, and the Secretary of Agriculture is authorized to cause such investigation to be made and such tests to be applied as he may deem necessary and to determine the true grade: Provided, That any appeal from such inspection and grading to the Secretary of Agriculture shall be taken before the grain leaves the place where the inspection appealed from was made and before the identity of the grain has been lost, under such rules and regulations as the Secretary of Agriculture shall prescribe. Whenever an appeal shall be taken or a dispute referred to the Secretary of Agriculture under this chapter, he shall charge and assess, and cause to be collected, a reasonable fee, in amount to be fixed by him, which fee, in case of an appeal, shall be refunded if the appeal is sustained. All such fees, not so refunded, shall be deposited and covered into the Treasury as miscellaneous receipts. The findings of the Secretary of Agriculture as to grade, signed by him or by such officer or officers, agent or agents, of the Department of Agriculture as he may designate, made after the parties in interest have had opportunity to be heard, shall be accepted in the courts of the United States as prima facie evidence of the true grade of the grain determined by him at the time and place specified in the findings."

7 U.S.C.A. § 84. "The Secretary of Agriculture shall, from time to time, make such rules and regulations as he may deem necessary for the efficient execution of the provisions of this chapter."

3. 7 Code of Federal Regulations, (1953), §§ 26.47–26.54 set forth the methods to be used in taking an appeal.

§§ 26.62 and 26.63 then provide for the filing of an objection to the grade shown on the first federal appeal grade certificate issued by the grain supervisor entertaining the appeal. § 26.62 provides: *"Objection to supervisor's grade may be filed.* Any party to an appeal may, not later than the close of business on the next business day after the issuance of the federal appeal grade certificate mentioned in Section 26.61, file with the grain supervisor issuing the same a statement objecting to the grade shown. The said grain supervisor may, for good cause shown, permit the filing of such statement after the time prescribed therefor in this section."

§ 26.63 provides: *"Review by board.* If such objection be filed as provided in § 26.62, a sample or samples of the grain involved, the papers and all other evidence shall be immediately submitted to a board of grain supervisors constituted for the purpose by the Administrator, which board shall carefully consider the papers and all available evidence, and make such examination and apply such tests as may be necessary to determine the grade of the grain. Such board shall, if the regulations be complied with, issue or cause to be issued a federal appeal grade certificate showing the grade assigned by such board to the grain, which federal appeal grade certificate shall supersede the federal appeal grade certificate previously issued for such grain and shall be the final federal appeal grade certificate issued."

If such an objection is not made, § 26.61 provides: *"Supervisor to determine grade.* The sample or samples of grain involved in an appeal, complying with §§ 26.72 and 26.73, shall be examined as soon as possible, such tests shall be applied as are necessary, the papers and all other available evidence shall be carefully considered, and, except as provided in § 26.60 a federal appeal grade certificate shall be issued by the grain supervisor entertaining the appeal, showing the grade assigned by him to such grain which shall be the final federal appeal grade certificate unless superseded as provided in § 26.63. Such federal appeal grade certificate shall supersede the certificate of grade for the grain involved, and such inspection certificate shall not thereafter represent the grade of the grain."

And provision for a hearing is found in § 26.55: *"Opportunity for hearing.*

presence of the necessary shipment of grain in interstate commerce. These findings, printed on one side of each federal appeal grade certificate, read as follows:

"Findings of the Secretary of Agriculture

"Standards having been fixed and established under the United States Grain Standards Act 1916 as amended, (39 Stat. 482; 54 Stat. 765; 7 U.S.C. 1940 ed, 71 et seq.) for grain of the kind specified in the Federal Appeal Grade Certificate on the reverse side hereof, and a certain quantity of such grain, located and identified as set forth in said certificate, having been sold, offered for sale, or consigned for sale, or shipped, or delivered for shipment in interstate or foreign commerce, and inspected by an inspector licensed under said Act and the regulations prescribed thereunder; a dispute having arisen as to whether the grade as determined by such inspection of said grain in fact conforms to the standard of the specified grade; the appellant having appealed the question to the Secretary of Agriculture, and the parties in interest having had opportunity to be heard; the necessary investigation having been made and tests applied; and said appeal having been taken before the grain left the place where the inspection appealed from was made and before the identity of the grain had been lost, in accordance with the regulations of the Secretary of Agriculture under said Act;

"Now, therefore, I have determined, and do hereby find, that the true grade of said grain at the time and place specified in the Federal Appeal Grade Certificate on the reverse side hereof is that stated in said certificate. * * *

"/s/ Ezra Taft Benson
Secretary of Agriculture."

It is evident that plaintiffs have failed to exhaust their administrative remedies. After the first federal appeal grade certificates had been issued by the grain supervisor entertaining the appeal, objections could have been filed and a complete review of the grade could have been obtained by plaintiffs in accordance with the pertinent regulations set forth in Footnote 3, supra. Furthermore, plaintiffs could also have obtained an oral hearing by complying with the above regulations. Each of them had notice of the federal appeal grade certificate which had been issued as to the flax in which they had an interest. Had they availed themselves of these administrative remedies, all of the questions which they seek to have litigated here could have been presented before the Board of Grain Supervisors and the Secretary of Agriculture or such officer of the department as he or the administrator designated. Here, the attack upon the validity of the federal appeal grade certificates is a collateral one. This action before the Court is for the alleged breach of the Grain Storage Agreements entered into between the parties, and plaintiffs seek to prove the invalidity of these certificates as a necessary step in proving there was such a breach. If no proper federal appeal inspection was made of the grain, then these agreements have been breached. If a proper federal appeal inspection was made, as the certificates indicate on their face, then the grade determined at that inspection is the grade to be used for the purpose of settlement under the agreement and there has been no breach. If an action or proceeding has an independent purpose and contemplates some other relief, although the overruling of the judgment may be important or even necessary to its success, the attack is collateral. Mitchell v. Village Creek Drainage Dist., 8 Cir., 158 F.2d 475. Where, as here, the action of an agency is of a quasi judicial character, it is well established that the validity of its order

Opportunity for hearing will be afforded interested parties as provided in § 6 of the act, if application therefor be made to the grain supervisor entertaining the appeal within 10 days after the issuance of the final federal appeal grade certificate. If no request for hearing be made by an interested party such hearing will be deemed waived. The Secretary or the Administrator, however, may order a hearing to investigate the circumstances surrounding an appeal."

cannot be attacked by collateral proceedings. Callanan Road Imp. Co. v. United States, 1953, 345 U.S. 507, 73 S.Ct. 803, 97 L.Ed. 1206; Stanley v. Supervisors of Albany County, 1886, 121 U.S. 535, 550, 7 S.Ct. 1234, 30 L.Ed. 1000; Reconstruction Finance Corp. v. Lightsey, 4 Cir., 185 F.2d 167. Between the provisions of the Grain Standards Act and the regulations issued thereunder, and the provisions of the Administrative Procedure Act, 5 U.S. C.A. § 1001 et seq., plaintiffs are afforded ample and sufficient opportunity to appeal these findings directly. They cannot now attack them in this collateral proceeding.

■■■ As to plaintiffs' contention that a "representative sample" within the meaning of the regulations issued under the United States Grain Standards Act could not be obtained by the belt or bin run method of sampling, there is a well-recognized legal principle which prevents this Court from exercising jurisdiction. The regulations require that inspection and grading of grain be based on a "representative sample". 7 Code of Fed. Reg., 1949 ed., §§ 26.21, 26.72, 26.73. Any administrative official authorized to review a grade determination must impliedly have the authority to determine whether it was based on a "representative sample" as required by the regulations. This is particularly true here where we are concerned with the interpretation of a standard set forth in a regulation issued by the agency. The plaintiffs had ample opportunity to raise this issue during administrative proceedings but failed to do so. The Secretary of Agriculture has not considered nor made a finding as to whether a "representative sample" was procured. Where a party has the opportunity to raise an issue in an administrative proceeding but fails to do so, he will not be allowed to raise that issue for the first time in a judicial review proceeding. United States v. L. A. Tucker Truck Lines, 1952, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54; see also National Labor Relations Board v. Cheney Cal. Lbr. Co., 1946, 327 U.S. 385, 66 S.Ct. 553, 90 L.Ed. 739, and Federal Power Comm. v. Colorado Interstate Gas Co., 1955, 348 U.S. 492, 75 S.Ct. 467, 99 L.Ed. 583, in which statutes are present. In the Tucker Truck Lines case, the court stated, 344 U.S. at pages 36–37, 73 S.Ct. at page 68,

"We have recognized in more than a few decisions, and Congress has recognized in more than a few statutes, that orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts. * * * Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."

This statement seems singularly applicable here where we are dealing with the interpretation of a standard to be applied in the inspection of grain—a query which should be directed in the first instance to the specialized skill and technical competency of the administrative officials who are trained to promote and maintain the aims and purposes of this act.

■■■ The Court sees no substance in plaintiffs' contention that the method of taking the appeal was not proper or authorized because it was taken before the grade determination from which it purported to be appealing had been made. There is nothing in 7 U.S.C.A. § 78 which requires as a condition precedent that an inspection certificate must have been issued before an appeal from that inspection may be taken. In fact, Section 26.49 of the regulations of the Secretary of Agriculture issued under the United States Grain Standards Act provides:

"Any party desiring to appeal may in advance transmit to the proper district headquarters office by telegraph, telephone, or otherwise, such information as may be necessary to enable the Grain Supervisor to pro-

ceed with the examination of the grain involved."

And obviously, when grain is being unloaded from a car into a terminal elevator or from a terminal elevator into a boat or barge, the only way a federal appeal can be obtained is to give notice of the appeal in advance so as to set in motion the procedure for the determination of a federal appeal grade of the grain involved. Certainly, in view of the sampling of this grain by the bin or belt run method, as the plaintiffs were advised, an advance notice of appeal was required by the very nature of the sampling of the grain. The identity of the grain would be lost if any party desired to take an appeal and did not give the notice of appeal until the grade and quality had first been established from which grading the appeal was to be taken. And in view of the notation on all of the loading orders that unload weights and grades would be used for settlement purposes, and the prior notice that federal appeal would be called on the belt run grade so made, there can be no serious question as to the regularity and propriety of the appeal which was taken by the defendant. Be that as it may, this is a matter which should have been placed before the administrative official, and for the reasons discussed above, the findings of the agency cannot be attacked now in this collateral proceeding.

Plaintiffs' remaining contentions are that the appeal was not taken before the identity of the grain was lost, and that the Secretary of Agriculture lacked jurisdiction to make the inspection because the flax involved was not in interstate or foreign commerce. The above observation that the validity of the findings of the Secretary of Agriculture cannot be attacked in this collateral proceeding are likewise applicable to these two jurisdictional contentions. See Sunshine Anthracite Coal Co. v. Adkins, 1940, 310 U.S. 381, 403, 60 S.Ct. 907, 84 L.Ed. 1263. We are confronted with specific findings of fact by the Secretary of Agriculture adverse to plaintiffs as to each of these contentions.

Moreover, it seems clear that there is no factual basis for plaintiffs' contention that the appeal was not taken before the identity of the grain was lost. To the contrary, where a belt or bin run method of sampling grain is used, the only method by which a sample for purpose of federal appeal could be obtained before the grain has lost its identity is the method which was used here; that is, the sample for purpose of federal appeal must be taken at the same time as the sample for the original grading by the licensed inspector is taken.

And the mere fact that portions of this grain had not crossed state lines at the time of the inspection is not necessarily determinative of its interstate character within the meaning of the United States Grain Standards Act. The record does indicate that a substantial portion of this grain was shipped to Superior, Wisconsin, and hence had crossed state lines. But the jurisdiction of the Secretary of Agriculture to make these inspections under the act must be determined from all of the circumstances surrounding the shipment and destination of this grain. To construe the act in any other way would greatly reduce the effectiveness of the inspection system established by Congress to carry out the purpose of the act. All of this grain had been sold by grade to defendant. Admittedly, this grain was shipped for storage to one of the three major terminal grain markets of the entire Northwest, that is, Minneapolis, Duluth, or Superior, Wisconsin, and was thereafter destined to enter into commerce either in the United States or in foreign ports. That the vast majority of it was intended either for interstate or foreign commerce, and a relatively insignificant portion ultimately would be consumed or used locally is a circumstance of which this Court can judicially take notice. See In re Farmers Coop. Ass'n, 69 S.D. 191, 8 N.W.2d 557; Edwards v. United States, 9 Cir., 91 F.2d 767, 778. Under the United States Grain Standards Act, 7 U.S.C.A. § 72, " 'in interstate or foreign commerce' " is defined to mean:

" * * * 'from any State, Territory, or District to or through any other State, Territory, or District, or to or through any foreign country, or within any Territory or District.' "

There can be no question as to the power of Congress to legislate as to the regulation of the shipments of grain with which we are concerned here. Congress has legislated as to the regulation of the sale and shipment by grade of grain, and the Court is of the opinion that the grain involved herein is obviously within the purview of the purposes of the United States Grain Standards Act, and that authority has been given to the Secretary of Agriculture to enforce the use of official grain standards as to it. Such a practical interpretation is in accord with the language of the act and is necessary to the efficient carrying out of its purposes. See 7 U.S.C.A. §§ 77, 78, 79. Furthermore, plaintiffs recognized that this grain was moving or being delivered into the channels of interstate or foreign commerce because they have incorporated into their contract the inspection and grading procedure of the United States Grain Standards Act as the means to be used to determine the grade of this grain for the purpose of settlement under the contract.

There were a few of plaintiffs' shipments of flax which were handled somewhat differently from the bulk of the shipments discussed above.[4] These shipments were similar to the majority inasmuch as there were no official weights or grades available at the plaintiffs' warehouses, one inspection was made using the probe method at a railroad hold point prior to the time each shipment arrived at its terminal elevator, and a second inspection was made at the time of unloading at the terminal elevator by means of the belt run method of sampling. Both of these inspections were made by properly licensed inspectors as required by the United States Grain Standards Act. However, there was no federal appeal called by either party as to any of these shipments. Each of these shipments was made between May 10, 1954, and May 26, 1954, at which time Grain Warehouseman's Circular Letter No. 59 was in effect. This letter provided that as to all cars going into storage the grain would be belt run and settlement made on the basis of the official belt run grade. The shipping orders did not set forth any intermediate inspection point and did state that settlement as to these shipments would be on the basis of the above letter. Settlement in each of these cases was made on the basis of the second grade determination which was made from the

| 4. Name of Plaintiff | Loading Order No. | Date Issued | Railroad Car No. |
|---|---|---|---|
| Elbow Lake Cooperative Grain Co. | 5432–C | 5–14–54 | Sou 13932 |
| | " | " | GN–44334 |
| Kent Doran Grain Co. | 5316–C | 5–17–54 | GN–44800 |
| | | | GN–25902 |
| | | | ACL–27666 |
| | | | CO–11062 |
| | | | GN–24889 |
| | | | GN–18289 |
| | | | NYC–179037 |
| | | | GN–30172 |
| | | | GN–50164 |
| | | | GN–18240 |
| | | | FWD–8644 |
| | | | MILW–707884 |
| Madison Farmer's Merc. & Elev. Co. | 5444–C | 5–18–54 | CO–11461 |

belt run inspection. Plaintiffs contend that the contract requires that the first grade determination be the basis of settlement as to these shipments.

For the same reasons set forth in discussing the majority of the shipments, the Court is of the opinion that the second grade determination was made at "destination". Therefore, if the federal appeal inspection on which it is based was a proper one under the United States Grain Standards Act, it is the proper basis of settlement under the contract.

As to each of these shipments there is a grain inspection certificate by a federally licensed grain inspector which contains a finding as to the grade of the grain shipped. Since no federal appeal has been taken as to this grade determination, we are but one step removed as to these shipments from the situation present in the majority of the cases; that is, the plaintiffs had available to them all of the steps for review of the grade determination by the administrative officials which were available in the majority of the shipments, plus the right to take a federal appeal—a step which had been taken in the other cases. Unless superseded by a federal appeal grade certificate issued in compliance with the regulations found in Footnote 3, the grade determination of the licensed inspector is the one in effect for the purposes of the United States Grain Standards Act. Plaintiffs contend here (a) that these grade determinations were not based on a "representative sample", and (b) that the inspectors lacked jurisdiction because the flax involved was not in interstate or foreign commerce. There is no material difference between the situation present here and that present as to the majority of the shipments. For the same reasons as set forth above, plaintiffs will not be allowed to raise these issues for the first time before this Court in these collateral proceedings. Furthermore, the Court is of the opinion that this flax was in the channels of interstate commerce and there was no lack of jurisdiction to make these inspections.

The Court concludes, therefore, that there is no genuine issue as to any material fact in the action now before it, and that the defendant is entitled to a summary judgment as a matter of law. A summary judgment should be, and is, granted to the defendant. It is so ordered. An exception is allowed.