**FARMERS COOPERATIVE ELEVATOR COMPANY et al., Plaintiffs,**

v.

**COMMODITY CREDIT CORPORATION, Defendant.**

Civ. No. 603.

United States District Court
D. South Dakota, N. D.
July 26, 1956.

George E. MacKinnon, U. S. Atty., and Kenneth G. Owens, Asst. U. S. Atty., St. Paul, Minn., and Clinton G. Richards, U. S. Atty., and Lyle E. Cheever, Asst. U. S. Atty., Sioux Falls, S. D., for defendant in support of said motion.

Gordon J. Berg, and Herbert F. Horner, Minneapolis, Minn., for plaintiffs in opposition thereto.

MICKELSON, Chief Judge.

The plaintiffs, 28 in number, are grain warehousemen operating country grain elevators in South Dakota. They are engaged in buying grain from local farmers and reselling it at terminal markets, especially at Minneapolis, Minnesota. They also store grain for local farmers when the producer does not desire to sell. They all entered into Uniform Grain Storage Agreements with the Commodity Credit Corporation in the years 1953 and 1954. Under the terms of these agreements, plaintiffs received, stored, handled, and loaded out the defendant's flaxseed to be shipped to designated terminals via rail. The real question presented in this litigation is whether the defendant has properly determined the official grade of the flax so as to allow the plaintiffs the amount of credit to which they are entitled. Briefly, the plaintiffs contend that the quality and grade of the defendant's flaxseed stored for and delivered to the defendant should be determined by the grade and dockage established by the so-called probe method of sampling the flax while still loaded in the boxcars instead of crediting the plaintiffs with the grade and dockage established under either the belt run or bin run methods of sampling. The plaintiffs contend that the belt or bin run method of sampling is contrary to the terms of the Uniform Grain Storage Agreement; that it violates Section 26.21 of the regulations of the Secretary of Agriculture promulgated under the United States Grain Standards Act; that therefore the sampling of the grain by such method does not produce an official grade.

There is no genuine issue of fact to be determined in this litigation. However, it appears essential to review the uncontroverted facts to arrive at an understanding of the conclusions of law to be drawn therefrom. A case almost identical to the instant one has recently been decided by the Honorable Gunnar H. Nordbye, United States District Judge for the District of Minnesota, in the case of Elbow Lake Cooperative Grain Co. v. Commodity Credit Corporation, D.C., 144 F.Supp. 54, in which Judge Nordbye granted defendant's motion for a summary judgment. This Court considers the reasoning and conclusions expressed in the Elbow Lake case exceptionally fine and takes the liberty of relying heavily upon that opinion in arriving at a decision in the instant case.

At the outset it is important to first consider the provisions of the Uniform Grain Storage Agreement entered into between the plaintiffs and the defendant, the salient provisions of which are as follows:

"12. Determination of Weights and Grades on Load Out—
The class, grade, quality and quantity of all the grain loaded out by

the warehouseman, whether stored, handled only, or direct transferred, and whether commingled or identity preserved, shall be determined on the basis of official weights and grades at the warehouse location, or if official weights or grades are not available at such point, on the basis of official weights and/or grades at destination or at the inspection point shown on the shipping order furnished the warehouseman, which, unless otherwise agreed, shall be the customary location on the route of shipment of an inspector licensed under the U. S. Grain Standards Act. Such inspection shall be for the account of Commodity. In the event either party calls for a federal appeal inspection,[1] such inspection shall be final and the expense thereof shall be for the account of the party requesting the appeal."

"19. Definitions— * * *

"(e) Official Grades—Grades and grading factors established by an inspector licensed under the U. S. Grain Standards Act in accordance with the Official Grain Standards of the United States and protein content established by recognized protein laboratory."

It is quite apparent that the parties intended to have a settlement between them as to grade, quality and quantity of the flax delivered to the defendant upon the basis of official weights and grades at one of three places: at the warehouse location; at the inspection point shown on the shipping order furnished the warehousemen; or at destination. No official grades were available at any warehouse in South Dakota as the United States Department of Agriculture has licensed no grain inspectors for this state. No intermediate points were designated upon the shipping orders furnished by defendant to plaintiffs.

On June 2, 1953, the defendant sent to each plaintiff Circular Letter No. 42 informing them that as to all "heavily loaded cars" which were so loaded by the warehousemen as to make it impracticable for the grain sampler to reach the bottom of the car with a standard five-foot probe, settlement would be made upon the basis of the official belt run grade. Later it appears that as a result of its experience with unevenly loaded cars, Commodity determined that the probe method of sampling flax was ineffective and did not produce a true grade of the flax, and that resort should be had to the belt run method of determining the quality and grade of the flax in all cases. Accordingly, on May 10, 1954, the defendant sent to each of the plaintiffs Circular Letter No. 59, which superseded No. 42, supra. This letter states that on all cars of flax unloaded by the warehousemen into cars for shipment going into storage, the flax would be belt run and settlement made upon the basis of official belt run. On May 26, 1954, an amendment of Circular Letter No. 59 was sent to each of the plaintiffs notifying them that in order to facilitate sampling each of the cars going into storage, the flax would be belt run and federal appeal would be called on the belt run grade thus made. And furthermore, that settlement with the warehousemen as to the grade or quality was to be based upon the federal appeal grade. As to each of the cars of flaxseed shipped by plaintiffs to defendant, it appears that three official grades were obtained. First, grain inspectors of the State of Minnesota and licensed as federal inspectors made probe tests of the flax in the cars before unloading and before the cars had reached the terminal to which they were sent. The belt or bin run samples upon which determinations of grade and quality were based were taken at the destination as the cars were being unloaded at and into the terminal elevators. They were made at designated places within the terminal

1. The Uniform Grain Standards Act, Commodity Credit Corporation form 25 (revised 5-1-52) uses the word "reinspection" rather than "inspection."

elevators, and the samples of flax upon which the second and third grade determinations were made were taken substantially at the same time with both a state and federal inspector present. In any event, the federal appeal referred to in the amendment to Circular Letter No. 59 was called on the second determination of grade and quality; that is, the appeal was taken from the grade determination based on the first belt or bin run sampling. Federal appeal grade certificates were issued in compliance with the regulations and copies were mailed to each of the plaintiffs. At no time did any of the plaintiffs file objections, as they could have under Sections 26.62 and 26.63 of the regulations, to the grade shown on the federal appeal grade certificate which was issued by the grain supervisor entertaining the appeal. Had objections been filed, the regulations provide for a complete re-examination of the flax samples and other evidence by a Board of Grain Supervisors to determine the true grade of the flax. Nor was oral hearing on the matter ever requested under Section 26.55 of the regulations.

Of the 262 cars of flax involved herein, 174 were unloaded at Minneapolis and the remaining 88 were unloaded at either Duluth, Minnesota, or Superior, Wisconsin. Plaintiffs contend first that the contract requires settlement as to the amount of credit to be allowed them for the flax loaded out upon the basis of the grade and dockage of the flax as was determined from samples taken directly from the car at the warehouse, or at the earliest subsequent transportation point where official grading is available. Therefore, they contend that settlement in each of the transactions involved herein should have been made on the basis of the grades determined from the samples taken by means of the probe method of sampling because these samples were·taken before the flax was unloaded from the boxcars and were taken at the earliest possible opportunity subsequent to the departure of the flax from the plaintiffs' warehouses. The Court cannot agree with this contention.

Each of the plaintiffs was notified that settlement as to each of the cars of flax shipped after May 26, 1954, would be belt run and that such settlement would be based upon the federal appeal grade. The defendant did not designate any intermediate inspection point so that it must follow that the settlement under the contract was to be made at "destination of the various cars of flax."

Plaintiffs particularly contend that as to the 88 cars which were first billed to Minneapolis, Minnesota, and then reconsigned to either Duluth, Minnesota, or Superior, Wisconsin, that Minneapolis rather than either Duluth or Superior was the "destination" as contemplated by the contract between the parties. The word "destination" is not defined in the contract and the word has no connotation which would suggest that the sampling of the flax should be taken either before or after the cars were unloaded. The pertinent provisions of the contract declare that "official weights and/or grades at destination or at the inspection point shown on the shipping order furnished the warehouseman, which, unless otherwise agreed, shall be the customary location on the route of shipment of an inspector licensed under the U. S. Grain Standards Act." It seems clear that the destination of this flax was the terminal warehouse where the flax was to be stored and not a railroad hold point. Prior to the shipment of each car of flax here involved, the plaintiffs were issued a loading order. Each of the loading orders issued to the plaintiffs state on their face:

"Billing destination: bill cars on straight bill of lading to destination shown."

"Settlement weights and grades: unload weights and grades will be used for settlement purposes irrespective of billing destination shown above."

The loading orders seem to make it quite clear that the billing destination

is not to be considered as "destination" for the purpose of determining the official weight and grade of the flax for settlement purposes. The destination is the terminal warehouse of each carload, and it was at this destination where the second and third grade determinations were made, and they established the official grade of the flax under the contract.

However, even if the contract is construed as the Court has heretofore indicated, plaintiffs challenge the right of defendant to predicate any appeal from a belt or bin run sampling of this flax. They contend (1) that the method of sampling was not authorized under the regulations which govern the inspections which are to be made by grain inspectors under the United States Grain Standards Act, 7 U.S.C.A. § 71 et seq.; (2) that the method of taking the appeal was not proper or authorized because it was taken before the grade determination from which it was appealing had been made; (3) that the appeal was taken after the grain had lost its identity.

The question as to whether defendant has complied with the contracts of the plaintiffs in making the settlement upon which it relies herein depends on whether the federal appeal inspection was made in compliance with the United States Grain Standards Act. The contract between the parties provides that the quality and grade of all grain loaded out by the plaintiffs shall depend upon the basis of "official weights and grades at places designated in the contract." And that "official grades" is to mean "grades and grading factors established by an inspector licensed under the United States Grain Standards Act in accordance with the official grain standards of the United States and protein content established by a regular protein laboratory." The contract further provides that if either party calls for a federal appeal inspection, that inspection shall be "final" as to the official grade. It therefore seems clear that the parties intended to use the grade determination made under the United States Grain Standards Act as the basis for determining the grade and quality of this flax for the purpose of settlement under the contract. The relevant portions of the United States Grain Standards Act are set forth in Footnote 2.[2] The relevant regulations issued by

2. 7 U.S.C.A. § 78. "Whenever standards shall have been fixed and established under this chapter for any grain and any quantity of such grain sold, offered for sale, or consigned for sale, or which has been shipped, or delivered for shipment in interstate or foreign commerce shall have been inspected and a dispute arises as to whether the grade as determined by such inspection of any such grain in fact conforms to the standard of the specified grade, any interested party may, either with or without reinspection, appeal the question to the Secretary of Agriculture, and the Secretary of Agriculture is authorized to cause such investigation to be made and such tests to be applied as he may deem necessary and to determine the true grade: Provided, That any appeal from such inspection and grading to the Secretary of Agriculture shall be taken before the grain leaves the place where the inspection appealed from was made and before the identity of the grain has been lost, under such rules and regulations as the Secretary of Agriculture shall prescribe. Whenever an appeal shall be taken or a dispute referred to the Secretary of Agriculture under this chapter, he shall charge and assess, and cause to be collected, a reasonable fee, in amount to be fixed by him, which fee, in case of an appeal, shall be refunded if the appeal is sustained. All such fees, not so refunded, shall be deposited and covered into the Treasury as miscellaneous receipts. The findings of the Secretary of Agriculture as to grade, signed by him or by such officer or officers, agent or agents, of the Department of Agriculture as he may designate, made after the parties in interest have had opportunity to be heard, shall be accepted in the courts of the United States as prima facie evidence of the true grade of the grain determined by him at the time and place specified in the findings."

7 U.S.C.A. § 84. "The Secretary of Agriculture shall, from time to time, make such rules and regulations as he may deem necessary for the efficient execution of the provisions of this chapter."

the Secretary of Agriculture under the authority of that Act are set forth in Footnote 3.[3]

On the reverse side of each of the federal appeal grade certificates covering each carload of flax involved herein are the findings of the Secretary of Agriculture as to the true grade of the flax, compliance with the statutory requirements for taking an appeal, and the presence of the necessary shipment of grain in interstate commerce. These findings read as follows:

"Findings of the Secretary of Agriculture

"Standards having been fixed and established under the United States Grain Standards Act 1916 as amended, (39 Stat. 482; 54 Stat. 765; 7 U.S.C. 1940 ed. 71 et seq.) for grain of the kind specified in the Federal Appeal Grade Certificate on the reverse side hereof, and a certain quantity of such grain, located and identified as set forth in said certificate, having been sold, offered for sale, or consigned for sale, or shipped, or delivered for shipment in interstate or foreign commerce, and inspected by an inspector licensed under said Act and the regulations prescribed thereunder; a dispute having arisen as to whether the grade as determined by such inspection of said grain in fact conforms to the standard of the specified grade; the appellant having appealed the question to the Secretary of Agriculture, and the parties in interest having had opportunity to be heard; the necessary investigation having been made and tests applied; and said appeal having been taken before the grain left the place where the inspection appealed from was made and

3. 7 Code of Federal Regulations (1953), Secs. 26.47–26.54 set forth the methods to be used in taking an appeal.

Secs. 26.62 and 26.63 then provide for the filing of an objection to the grade shown on the first federal appeal grade certificate issued by the grain supervisor entertaining the appeal. Sec. 26.62 provides: *"Objection to supervisor's grade may be filed.* Any party to an appeal may, not later than the close of business on the next business day after the issuance of the federal appeal grade certificate mentioned in Section 26.61, file with the grain supervisor issuing the same a statement objecting to the grade shown. The said grain supervisor may, for good cause shown, permit the filing of such statement after the time prescribed therefor in this section."

Sec. 26.63 provides: *"Review by board.* If such objection be filed as provided in Sec. 26.62, a sample or samples of the grain involved, the papers and all other evidence shall be immediately submitted to a board of grain supervisors constituted for the purpose by the Administrator, which board shall carefully consider the papers and all available evidence, and make such examination and apply such tests as may be necessary to determine the grade of the grain. Such board shall, if the regulations be complied with, issue or cause to be issued a federal appeal grade certificate showing the grade assigned by such board to the grain, which federal appeal grade certificate shall supersede the federal appeal grade certificate previously issued for such grain and shall be the final federal appeal grade certificate issued."

If such an objection is not made, Sec. 26.61 provides: *"Supervisor to determine grade.* The sample or samples of grain involved in an appeal, complying with Secs. 26.72 and 26.73, shall be examined as soon as possible, such tests shall be applied as are necessary, the papers and all other available evidence shall be carefully considered, and, except as provided in Sec. 26.60 a federal appeal grade certificate shall be issued by the grain supervisor entertaining the appeal, showing the grade assigned by him to such grain which shall be the final federal appeal grade certificate unless superseded as provided in Sec. 26.63. Such federal appeal grade certificate shall supersede the certificate of grade for the grain involved, and such inspection certificate shall not thereafter represent the grade of the grain."

And provision for a hearing is found in Sec. 26.55: *"Opportunity for hearing.* Opportunity for hearing will be afforded interested parties as provided in Sec. 6 of the act, if application therefor be made to the grain supervisor entertaining the appeal within 10 days after the issuance of the final federal appeal grade certificate. If no request for hearing be made by an interested party such hearing will be deemed waived. The Secretary or the Administrator, however, may order a hearing to investigate the circumstances surrounding an appeal."

before the identity of the grain had been lost, in accordance with the regulations of the Secretary of Agriculture under said Act;

"Now, therefore, I have determined, and do hereby find, that the true grade of said grain at the time and place specified in the Federal Appeal Grade Certificate on the reverse side hereof is that stated in said certificate. * * *

"/s/ Ezra Taft Benson
Secretary of Agriculture."

It appears to the Court that plaintiffs have failed to exhaust their administrative remedies. After the first federal appeal grade certificates had been issued by the grain supervisor entertaining the appeal, objections could have been filed and a complete review of the grade could have been obtained by plaintiffs in accordance with the pertinent regulations set forth in Footnote 3, supra. Plaintiffs could also have obtained an oral hearing by complying with the above regulations. Each of them had notice of the federal appeal grade certificate which had been issued as to the flax in which they had an interest. Had they availed themselves of these administrative remedies, all of the questions which they seek to litigate here could have been presented before the Board of Grain Supervisors and the Secretary of Agriculture or such officer of the department as he or the administrator designated. Plaintiffs' attack upon the validity of the federal appeal grade certificate is a collateral one. This action is before the Court based upon the alleged breach of the Grain Storage Agreements entered into between the parties, and plaintiffs seek to prove the invalidity of these certificates as a necessary step in proving there was such a breach of the contract. If a proper federal appeal inspection was made, as the certificates indicate, then the grade determined at that inspection is the grade to be used for the purpose of settlement under the agreement between the parties and there has been no breach of contract. Quoting from Judge Nordbye's opinion in the Elbow Lake case [144 F.Supp. 54]:

"If an action or proceeding has an independent purpose and contemplates some other relief, although the overruling of the judgment may be important or even necessary to its success, the attack is collateral. Mitchell v. Village Creek Drainage Dist., 8 Cir., 158 F.2d 475. Where, as here, the action of an agency is of a quasi judicial character, it is well established that the validity of its order cannot be attacked by collateral proceedings. Callanan Road Imp. Co. v. United States, 1953, 345 U.S. 507, 73 S.Ct. 803, 97 L.Ed. 1206; Stanley v. Board of Supervisors, 1886, 121 U.S. 535, 550, 7 S.Ct. 1234, 30 L.Ed. 1000; Reconstruction Finance Corp. v. Lightsey, 4 Cir., 185 F.2d 167. Between the provisions of the Grain Standards Act and the regulations issued thereunder, and the provisions of the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., plaintiffs are afforded ample and sufficient opportunity to appeal these findings directly. They cannot now attack them in this collateral proceeding."

As a basis for their contention that the federal appeal grade certificates are invalid, plaintiffs contend that a "representative sample" within the meaning of the regulations issued under the United States Grain Standards Act could not be obtained by the belt or bin run method of sampling. As to this contention, there is a well recognized legal principle which prevents this Court from exercising jurisdiction. The regulations require that inspection and grading of grain be based on a "representative sample." 7 Code of Fed.Reg., 1949 ed., Secs. 26.21, 26.72, 26.73. Any administrative officials authorized to review a grade determination must impliedly have the authority to determine whether it was based on a "representative sample" as required by the regulations. This is particularly true where, as here, we are concerned with the interpretation of a standard set forth in a regulation issued by the agency. The

plaintiffs had ample opportunity to raise this issue during administrative proceedings but failed to do so. The Secretary of Agriculture has not considered nor made a finding as to whether a "representative sample" was procured. Where a party has the opportunity to raise an issue in an administrative proceeding but fails to do so, he will not be allowed to raise that issue for the first time in a judicial review proceeding. United States v. L. A. Tucker Truck Lines, 1952, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54; see also National Labor Relations Board v. Cheney Cal. Lbr. Co., 1946, 327 U.S. 385, 66 S.Ct. 553, 90 L. Ed. 739, and Federal Power Comm. v. Colorado Interstate Gas Co., 1955, 348 U. S. 492, 75 S.Ct. 467, 99 L.Ed. 583. In the Tucker Truck Lines case, the court stated, 344 U.S. at pages 36–37, 73 S.Ct. at page 68:

"We have recognized in more than a few decisions, and Congress has recognized in more than a few statutes, that orderly procedure and good administration require that objections to the proceedings of an administrative agancy be made while it has opportunity for correction in order to raise issues reviewable by the courts. * * * Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."

The above statement seems particularly applicable here where we are dealing with the interpretation of a standard to be applied in the inspection of grain— a matter which should have been directed in the first instance to the specialized skill and technical knowledge of the administrative officials who are trained to promote and maintain the aims and purposes of this act. As to plaintiffs' contention that the method of taking the appeal was not proper or authorized because it was taken before the grade determination from which it purported to be appealing had been made, this Court finds to be without merit. There is nothing contained in 7 U.S.C.A. § 78 which requires as a condition precedent that an inspection certificate must have been issued before an appeal from that inspection may be taken. In fact, Section 26.49 of the regulations provides:

"Any party desiring to appeal may in advance transmit to the proper district headquarters office by telegraph, telephone, or otherwise, such information as may be necessary to enable the Grain Supervisor to proceed with the examination of the grain involved."

When grain is being unloaded from a boxcar into a terminal elevator or from a terminal elevator into a boat or barge, the only way a federal appeal grade can be obtained is to give notice of the appeal in advance so as to set in motion the procedure for the determination of a federal appeal grade of the grain involved because of the fact that the unloading of the grain destroys its identity. Certainly, in view of the sampling of this flax by the belt or bin run method, as the plaintiffs were advised it would be done, an advance notice of appeal was required by the very nature of the sampling. Furthermore, in view of the notation on all of the loading orders that unload weights and grades would be used for settlement purposes, and the prior notice that federal appeal would be called on the belt run grade so made, there can be no serious question as to the regularity and propriety of the appeal which was taken by the defendant, but regardless of how this should or should not have been done, it is a matter which should have been taken before the administrative official, and for the reasons hereinbefore discussed, the findings of the agency cannot be attacked in this collateral proceeding.

This Court finds no basis for plaintiffs' contention that the appeal taken by the defendant was not taken before the identity of the flax had been lost.

The findings of the Secretary of Agriculture are to the contrary and cannot be attacked in this collateral proceeding.

The Court concludes, therefore, that there is no genuine issue as to any material fact in the action now before it, and that the defendant is entitled to a summary judgment as a matter of law. A summary judgment should be, and is, granted to the defendant. It is so ordered. An exception is allowed.