## ST. PAUL MERCURY INDEMNITY CO. v. UNITED STATES.

### No. 4473.

United States Court of Appeals
Tenth Circuit.

Dec. 12, 1952.

Homer V. Gooing, Wichita, Kan. (Howard T. Fleeson, Wayne Coulson, Paul R. Kitch, Dale M. Stucky and Donald R. Newkirk, Wichita, Kan., on the brief), for appellant.

Neil Brooks, Associate Sol., U. S. Dept. of Agriculture, Washington, D. C., and Giles H. Penstone, Regional Atty., U. S. Dept. of Agriculture, Chicago, Ill. (Eugene W. Davis, U. S. Atty., Topeka, Kan., George R. Springborg, Lincoln, Neb., and Katherine A. Markwell, Attys., U. S. Dept. of Agriculture, Washington, D. C., on the brief), for appellee.

Before PHILLIPS, Chief Judge, and BRATTON and MURRAH, Circuit Judges.

PHILLIPS, Chief Judge.

On July 16, 1947, the Commodity Credit Corporation,[1] entered into a Uniform Grain Storage Agreement[2] with Myrle Banz and Leonard Banz, copartners doing business as Sylvia Grain Company, at Sylvia, Kansas. Thereafter, the partnership was dissolved and Leonard Banz,[3] as its successor, entered into a supplemental agreement with Commodity, extending the storage agreement for a period of one year. The storage facilities consisted of an elevator of wooden construction and two concrete storage tanks. Each storage tank had a capacity of 20,000 bushels.

On May 12, 1948, Banz, as principal, and St. Paul Mercury Indemnity Company,[4] as surety, entered into a statutory public warehouse bond, in accordance with the requirements of § 34–229, Gen.Stat. of Kan. 1949, in the penal sum of $5,800. The condition of the bond was that the principal should "well and faithfully perform all of his duties as such public warehouseman."

Section 34–263, Gen.Stat. of Kan.1949, provides that a warehouseman shall be liable for any loss or injury to grain stored with him "by his failure to exercise such care in regard to it as a reasonably careful owner of similar grain would exercise." Section 34–250, Gen.Stat. of Kan.1949, provides that "A warehouseman, in the absence of some lawful excuse provided by this Act, is bound to deliver the grain upon a demand made either by the holder of a receipt for the grain, or by the depositor, * * *. In case the warehouseman refuses or fails to deliver the grain in compliance with the demand by the holder or depositor so accompanied, the burden shall be upon the warehouseman to establish the existence of a lawful excuse for such refusal."

During the summer of 1948, Banz received for storage in such facilities 44,363 bushels and 20 pounds of wheat, against which he issued negotiable warehouse receipts which were subsequently negotiated to Commodity.

By the terms of the storage agreement, Banz was obligated to receive, store, insure and condition grain in accordance with the directions of Commodity; to maintain at all times in the warehouse "a stock of grain of the class, grade and quality of the grain described in the outstanding warehouse receipts"; to "load out or deliver to the holder of any warehouse receipt grain

1. Hereinafter referred to as Commodity.

2. Hereinafter referred to as the storage agreement.

3. Hereinafter referred to as Banz.

4. Hereinafter called the Indemnity Company.

of the same class, grade, quantity and quality, or better"; and in the event any of the grain loaded out should be found to be "of a class, grade, quantity or quality lower than that described by warehouse receipts" to "indemnify Commodity [Credit Corporation] in an amount equal to the difference between the value of the grain loaded out and the value of the grain described by the warehouse receipts and accompanying certificates or documents, on the basis of cash prices current at the terminal market customarily applicable to grain stored in the warehouse at the time when the grain was shipped."

A large portion of the wheat was stored in the two concrete tanks. A small portion of it was stored in bins in the wooden elevator.

While Banz made some efforts to aerate the wheat and eliminate sunshine heat during the period it was being received at the elevator, he turned all the wheat for the first time in August, 1948. He turned it again in September, 1948, and again in December, 1948. He started to turn it again in February, 1949, and found it was out of condition and he did not complete the fourth turning of the wheat.

Banz tested the wheat for moisture at the time he received it for storage and at each time he turned it. He made no tests for heat or insect infestation, except to hold small portions of the wheat in his hands and look at it at the times when he turned it. He made no tests of any kind between the times he turned the wheat.

In September, 1948, Banz undertook to treat the wheat with a fumigant known as Weevil-Cide, but he failed to comply with the instructions of the manufacturer, either as to quantity or the method of application, and the quantity of fumigant applied was inadequate.

After discovering the wheat was out of condition in February, 1949, Banz discontinued turning it and made no further efforts to preserve it.

On February 15 and 18, 1949, after discovering that the wheat had gone out of condition, Banz shipped two carloads of the stored wheat to the Rodney Milling Company.[5] The shipments aggregated 2,-651 bushels. The wheat graded sample. By letter, dated February 26, 1949, Banz notified Commodity that the wheat was going out of condition and requested instructions. On February 28, 1949, Commodity requested a list of the persons to whom the warehouse receipts had been issued, and advised that Commodity would send a representative to take samples of the wheat. The list was furnished and the samples were taken early in March, 1949. On April 13, 1949, Commodity issued instructions to Banz to load out and ship the wheat covered by its warehouse receipts. Banz received such instructions on April 15, 1949. Banz, between April 18 and April 29, 1949, shipped 18 carloads of the stored wheat, aggregating 33,188 bushels and 50 pounds. Early in the morning of April 29, 1949, the elevator was destroyed by fire. Banz assigned his rights under the insurance policy covering the grain in storage to Commodity. Banz also assigned to Commodity a claim against Rodney, for commission on account of wheat purchased, stored and handled by Banz as Rodney's agent.

The 18 carloads of wheat shipped in April, 1949, were of sample grade. The wheat in 7 cars was sour and in 11 cars musty. The wheat in 7 of the cars was also infested with weevils. The total damage to the wheat shipped ranged from 16 percent to 92 percent. The wheat, except for one car where the damage was only 16 percent, was condemned as unfit for human consumption.

The difference between the value of the 33,188.83 bushels of wheat shipped by Banz on Commodity's instructions and the value of a like quantity of wheat of the grade, class and quality described in Commodity's warehouse receipts was $15,650.34.

Banz failed to load out and ship on Commodity's instructions 11,175 bushels and 30 pounds of wheat, covered by warehouse receipts held by Commodity. The value of that amount of wheat of the grade, class and quality described in the warehouse re-

5. Hereinafter referred to as Rodney.

ceipts held by Commodity, computed on the applicable market price fixed by the storage agreement, was $22,825.94.

The United States brought this action against Banz, Rodney and the Indemnity Company. The amended complaint contained four claims. The first claim was predicated on the storage agreement and sought recovery for the failure of Banz to load out and deliver 33,188.83 bushels of wheat of the grade, class and quality described by Commodity's warehouse receipts and the failure of Banz to load out and deliver 11,175 bushels and 30 pounds of wheat of the grade, class and quality described by Commodity's warehouse receipts.

By the second claim Commodity sought recovery from Rodney on the assigned claim for commission.

By the third claim Commodity sought recovery from Rodney for conversion, by Rodney, of the 2,651 bushels of wheat shipped by Banz to Rodney.

By the fourth claim Commodity sought recovery from the Indemnity Company on the statutory bond.

Commodity also sued, as garnishees, the insurance carriers under insurance policies covering the elevator buildings.

Rodney filed an answer and cross-complaint. It denied any indebtedness to Banz and alleged that from time to time it purchased wheat from and financed the purchase of wheat by Banz and that as a result of such transactions Banz was indebted to Rodney in the amount of $6,331.40. It sought recovery against Banz for that amount.

The insurance carriers paid to Commodity $17,859.74 on account of the loss of grain stored in the elevator. Pursuant to a stipulation entered in the garnishment proceedings, $4,230.81 was paid by the insurance carriers to Commodity on account of the loss of the elevator buildings.

Before the trial, Commodity, Banz, and Rodney entered into a compromise of the assigned commission claim, the alleged conversion claims, and the cross-claim of Rodney against Banz, under which Rodney paid to Commodity $5,000. The parties entered into a stipulation which recited the compromise and provided that Commodity would dismiss the second and third causes of action with prejudice and that Rodney would dismiss its cross-claim with prejudice. An order dismissing the two claims and the cross-claim was entered. Commodity, the co-partnership, and Banz executed and delivered to Rodney a general release of all claims, demands, suits, and actions of any nature arising out of transactions between the partnership and Leonard Banz and Rodney.

The trial court concluded that Banz was liable as an insurer under the storage agreement; that the burden of proving a lawful excuse for failure to deliver wheat of the class, grade, quantity, and quality described by the warehouse receipts rested on Banz;[6] and that Banz was negligent in the care of the wheat. After applying the credits, the court awarded a judgment against Banz and the Indemnity Company for $3,631.65 principal and $2,011.82 interest to the date of the judgment and interest on the aggregate of such sums at six per cent per annum from the date of the judgment until paid. The Indemnity Company has appealed.

The Indemnity Company asserts that with respect to the 2,651 bushels of wheat shipped to Rodney, Banz and Rodney were joint tort feasors and that the release of Rodney from the claim for conversion discharged Banz from any liability on account of the 2,651 bushels of wheat. We may assume, without deciding, that Banz and Rodney were joint tort feasors. But, applying that assumption, we do not think the result contended for by the Indemnity Company follows. The 2,651 bushels of wheat had gone out of condition and were sample grade. The liability for conversion was the value of that wheat at the time and place of conversion.[7] The value of 2,651 bushels of wheat of the class,

6. Such conclusion is in accord with our decision in Denning Warehouse Co. v. Widener, 10 Cir., 172 F.2d 910, 912–913, 13 A.L.R.2d 669.

7. Kapsemalis v. Taylor, 10 Cir., 112 F.2d 406, 408.

grade and quality described in the warehouse receipts at the applicable market price of $2.055 was $5,447.81. While the exact amount of deterioration of the 2,651 bushels of wheat is not established, it is a reasonable assumption that it had deteriorated at least 16 per cent, or $871.65, in value. It follows that the value of the converted wheat did not exceed $4,576.16. Some portion of the $5,000 must have been paid to discharge other liabilities of Rodney. However, the first claim in the amended complaint against Banz was predicated on the storage agreement. Under the storage agreement, Banz was liable to Commodity not only for the value of the 2,651 bushels of wheat in its deteriorated condition, but also for the difference between the value of such deteriorated wheat and the applicable market value of wheat of the class, grade, and quality described by the warehouse receipts held by Commodity. Even an express discharge of Banz of his liability for the value of the 2,651 bushels of deteriorated wheat would not have discharged Banz from such additional contract liability. Banz received credit for the $5,000 paid by Rodney, which was more than the value of the deteriorated 2,651 bushels of wheat shipped to Rodney. Even if his tort liability was discharged by the release of Rodney, he received full credit for the discharge of that liability. The discharge of that liability did not release him from his additional contract liability to Commodity. Banz should not be placed in a more favorable position by reason of the fact that he converted 2,651 bushels of the deteriorated wheat, even though his tort liability was discharged, than he would have been had he loaded and shipped such wheat on Commodity's demand.

Moreover, under the law of Kansas, the effect of a release or discharge of one tort feasor with respect to the liability of another person is to be determined by the intention of the parties as manifest by the instrument.[8] Here, the stipulation and release must be read together. The fact that the stipulation provided for the dismissal of the second and third claims with prejudice and the cross-claim with prejudice and said nothing about the first claim indicates, we think, that the parties intended that the only effect on the first claim was to be the application of the $5,000 as a credit thereon.

The fourth claim is predicated on the bond and arises by reason of a breach of statutory duties imposed on warehousemen by the statutes of Kansas. Such an action against a warehouseman is essentially one in assumpsit.[9]

We are of the opinion that the evidence established that Banz failed to exercise such care, in regard to the wheat stored with him and covered by the warehouse receipts held by Commodity, as a reasonably careful owner of similar grain would exercise, in the following particulars: (1) he did not turn the wheat often enough; (2) he did not properly check its condition or make proper tests for heating; and (3) he did not use due care to guard against insect infestation in that (a) he did not apply enough fumigant, (b) he did not apply the fumigant in the proper manner, (c) he did not turn the grain soon enough after fumigation, (d) he did not make proper tests to ascertain whether the fumigant had been effective or to find out whether the grain was infested with weevils.

It follows that Banz was liable for breach of his statutory duty and that the Indemnity Company was liable on its bond as surety because Banz failed to well and faithfully perform all of his duties as a public warehouseman.

The trial court found that the Indemnity Company, although aware of its obligations to Commodity under its bond, had unreasonably and vexatiously delayed payment. Certainly, that was true after all of the credits had been arrived at long prior to the trial. Moreover, we think the allowance of interest was governed by Federal law. In Royal Indemnity Co. v. United States, 313 U.S. 289, 296, 61 S.Ct. 995, 997, 85 L.Ed. 1361, the court said:

"But the rule governing the interest to be recovered as damages for delayed

---

8. Edens v. Fletcher, 79 Kan. 139, 98 P. 784, 19 L.R.A.,N.S., 618.

9. Lee v. Midwest Cold Storage & Ice Corp., 155 Kan. 876, 130 P.2d 574, 577.

payment of a contractual obligation to the United States is not controlled by state statute or local common law. In the absence of an applicable federal statute it is for the federal courts to determine, according to their own criteria, the appropriate measure of damage, expressed in terms of interest, for nonpayment of the amount found to be due. Board of Commissioners of Jackson County v. United States, 308 U.S. 343, 350, 352, 60 S.Ct. 285, 288, 289, 84 L.Ed. 313; Young v. Godbe, supra, 15 Wall. [562] page 565, 21 L.Ed. 250; cf. Billings v. United States, 232 U.S. 261, 284, et seq., 34 S.Ct. 421, 425, 58 L.Ed. 596."

Even though the exact amount due was not determined until the amount of credits was arrived at, the court, in the exercise of its sound discretion, could award interest or its equivalent as an element of damages. In Concordia Ins. Co. of Milwaukee v. School District No. 98, 282 U.S. 545, 554, 51 S.Ct. 275, 278, 75 L.Ed. 528, the court said:

"* * * even in a case of unliquidated damages, 'when necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as an element of damages.' " [10]

We believe the facts justified the inclusion of interest.

Affirmed.

---

[10.] Miller v. Robertson, 266 U.S. 243, 257, 258, 45 S.Ct. 73, 69 L.Ed. 265; Funkhouser v. J. B. Preston Co., 290 U.S. 163, 168, 169, 54 S.Ct. 134, 78 L.Ed. 243; Robberson Steel Co. v. Harrell, 10 Cir., 177 F.2d 12, 17.