TULSA GRAIN STORAGE COMPANY, a co-partnership consisting of Edgar Davis, John R. Potts, Jim Potts and R. D. Taylor; E & E Grain Storage, a co-partnership consisting of Willard A. Emery, Joe O. Ellis and Lloyd Fleming; Reading Grain Storage Company, a co-partnership consisting of George Thompson, R. O. Harris, Ted Dewitt, W. F. Dorney and Lloyd B. Fleming; Sapulpa Grain Storage Company, a co-partnership consisting of Allen S. James, Jr., Rex Baugh and Fern H. Pray; Dewey Grain Co., Inc., an Oklahoma corporation; W. J. Lamberton, d/b/a W. J. Lamberton Warehouse; Thomas A. Scherer d/b/a Scherer Grain Storage Company; Oologah Feed Company, a co-partnership consisting of W. D. Speer and R. J. Keeling; Triplett Grain & Storage Company, a co-partnership consisting of Robert L. Triplett, Harold F. Davis and W. D. Speer; J F W Company, a co-partnership consisting of Joe Francis, Nathan Janco, Stewart W. Mark, Charles L. Follansbee, Jr., B. J. McPherson, Robert Wilson and John W. Elder, Plaintiffs,

v.

COMMODITY CREDIT CORPORATION and St. Louis & San Francisco Railway Company, a corporation, Defendants.

No. 5463.

United States District Court
N. D. Oklahoma.

July 14, 1964.

Joe Francis, Houston, Klein & David-son, A. M. Covington, Tulsa, Okl., for plaintiffs.

John M. Imel, U. S. Atty., Tulsa, Okl., for defendants.

BARROW, Chief Judge.

Plaintiffs are public warehousemen licensed under the laws of Oklahoma to engage in the grain warehouse storage business. Plaintiffs entered into contracts with the Defendant, the Commodity Credit Corporation, an agency and instrumentality of the United States, created by the Commodity Credit Corporation Charter Act (15 U.S.C.A. § 714 et seq.) for the storage of Government owned wheat. These contracts are generally known as "Uniform Grain Storage Agreements".

Plaintiffs filed this action against the Defendant seeking a declaratory judgment directing and ordering Commodity Credit Corporation (hereinafter called "Commodity") to give Plaintiffs a total credit of $210,530.37, representing the value of 87,357 bushels of wheat which allegedly shrank, due to moisture loss, while stored in Plaintiffs' warehouse facilities. Commodity filed answers denying that Plaintiffs are entitled to such credit. Commodity also filed counterclaims against all but one of the Plaintiffs and their sureties on warehouse bonds seeking recovery for the value of shortages of wheat which Plaintiffs failed to deliver to Commodity on loading orders issued to Plaintiffs pursuant to the provisions of their contracts.

After trial of the case, the parties were given an opportunty to file briefs on the remaining question to be decided by the Court. The material facts are not in dispute. The parties have agreed that the wheat stored by Plaintiffs for Commodity was commingled grain; and that Plaintiffs were insurers of the grain stored. They have further agreed as to the quantities of wheat shipped by Commodity to Plaintiff for storage; the quantities returned to CCC; the amounts of the shortages representing wheat which the Plaintiffs failed to return to Commodity; and the amount of shrinkage or moisture lost during storage.

The rights, liabilities, and duties of the Plaintiffs and Commodity, with regard to the Government-owned wheat involved in this controversy, are governed by the terms of the Uniform Grain Storage Agreements entered into by the parties. The only question to be determined, then, is whether, under the contracts between the parties, the warehousemen are required to deliver to Commodity, on demand and surrender of negotiable warehouse receipts, the same quantity of wheat which Commodity stored, or whether they are entitled to credit for shrinkage due to loss of moisture during storage and are obligated to deliver back to Commodity the quantity stored less the moisture lost.

Under their contracts, Plaintiffs agreed to store Government-owned wheat, on a commingled basis, at an agreed warehouse rate to be paid by the Government. The storage rate for commingled grain is set forth in these contracts, and is substantially higher than the rate for identity preserved wheat. Commodity shipped large quantities of wheat to Plaintiffs for storage under the contracts. No official weights and grades were available at the location of Plaintiffs warehouses, thus in accordance with Section 8 of the contracts, Plaintiffs issued their negotiable warehouse receipts to Commodity on the basis of official weights and grades at the point of origin from which the wheat was shipped.

Paragraph 19(g) of the contract defines "official weights" as those established by an official weighmaster. When official weights are determined, weight certificates are issued showing the exact number of pounds of wheat weighed, and the warehouseman enters the number of actual pounds of wheat on the warehouse receipt. The warehouse receipt is the contract of the warehouse to deliver the same quantity of wheat, by weight, to the holder of the warehouse receipt upon surrender thereof to the warehouse.

The grades of wheat are also shown on the warehouse receipt, and the warehouse is obligated to deliver the same quality of wheat, or settle with the warehouse receipt holder for the difference in value. Official grades are determined in accordance with the United States Grain Standards Act and the regulations issued thereunder. 7 U.S.C. § 71 et seq.; 7 C.F.R. § 26.101 et seq. In order to meet United States Grain Standards for United States Grades No. 1, 2, 3, 4, and 5, wheat must have less than 14 percent moisture. When the moisture content is less than 14 percent, it is not a factor in determining official grade. Under the grain standard regulations, appeals may be taken from official determinations of grades, and failure to exhaust this administrative remedy precludes any collateral attack upon the grade determination. Farmers Co-op. Elevator Company v. Commodity Credit Corporation, 144 F.Supp. 65 (D.C.1956); Elbow Lake Co-op. Grain Co. v. Commodity Credit Corporation, D.C., 144 F.Supp. 54, affirmed 8 Cir., 251 F.2d 633. At no time have the Plaintiffs objected to or appealed from determinations of official weights or official grades. Rather, they issued their negotiable warehouse receipts on the basis of official weights and grades as determined, contracting thereby to redeliver the same quantity and quality to Commodity Credit Corporation upon demand.

By the terms of the Agreements, Plaintiffs contracted that they would at all times maintain in their warehouse a stock of grain of the quantity, class, and grade which they were obligated to deliver against the warehouse receipts, and that they would be responsible for the condition of the wheat stored.

Section 11 of the contract sets forth the obligation of the Plaintiffs to deliver the grain to Commodity upon surrender of the warehouse receipts (originally issued on the basis of official weights and grades specifying the delivery of a specific quantity in pounds and quality by grade), representing the grain stored in the warehouse. Section 11(j) provides that the Plaintiffs "shall be liable as an insurer and indemnify CCC as provided in Section 13 for any failure to deliver grain meeting the requirements of this section."

Section 12 provides that when the grain is ordered shipped official weights and grades are to be determined in the same manner as when the grain was originally stored. Where official weights and grades are not available at the warehouse location, they are to be determined at destination when the grain is loaded out.

The manner of settlement for differences in quantity and quality when grain is loaded out is set forth in Section 13.[1]

---

1. Section 13 of the Agreement provides in pertinent part as follows:

"(c) At locations where official weights and official grades are not available, settlement for differences between the value of the commingled grain which is loaded out by the warehouseman and which is accepted by CCC and the grain ordered shipped by CCC shall be made in accordance with the following:

"(i) In settling for differences in quantity (except in case of conversion where settlement shall be made on such legally applicable basis as CCC may demand), values shall be determined on the basis of domestic cash prices current in the applicable terminal market as of the date of acceptance by the carrier of the final shipment under the applicable loading order or, when mutually agreeable to the warehouseman and CCC, on the date each shipment is accepted by the carrier. With respect to short weight cars, where the official report of the condition of the car shows evidence of actual loss, the warehouseman shall be allowed a quantity

Under that section, when grain is loaded out from locations where official weights and grades are not available, the warehouseman is allowed a *quantity* tolerance of ⅛ of 1% of the gross loading weights. The warehouseman is liable for immediate cash payment to CCC for any under-deliveries in *quality*, except insofar as they are offset by over-deliveries in quality of the same kind of grain during the three calendar years immediately prior to shipment.

Section 18 of the Uniform Grain Storage Agreement requires Commodity to pay warehouse charges on the basis of grain represented by the warehouse receipts. Plaintiffs billed Commodity for warehouse charges at the rates for commingled grain as provided by the contracts, and these billings were based upon official weights of the Government owned grain as reflected on the warehouse receipts issued by Plaintiffs to Commodity. Plaintiffs at no time reduced warehouse charges on account of alleged shrinkage or moisture loss, but charged the Government warehouse charges for the amounts of wheat deposited for storage. Commodity paid

Plaintiffs warehouse charges as billed on that basis.

Prior to the present controversy between Plaintiffs and Commodity, loading orders had been issued pursuant to the contracts, calling for shipment of some of the stored grain. Plaintiffs shipped the wheat under such loading orders, and settlements were made as provided for under Section 13 of the contracts. Under these settlements, determinations were made as to the difference in the value between the grain ordered shipped by CCC and the grain loaded out by the Plaintiffs. Such settlements were arrived at on the basis of official weights and grades shown on Plaintiffs' warehouse receipts issued to Commodity and the official weights and grades "at destination." If Plaintiffs shipped more grain than ordered shipped, Commodity would pay Plaintiffs the difference in the value of the overdelivery of grain. If Plaintiffs shipped a lesser quantity than ordered shipped by Commodity, Plaintiffs would pay Commodity for the value of the shortage or underdelivery.

No controversy over the interpretation of these contracts, or the manner of set-

tolerance of ⅛ of 1% of the gross loading weights. The warehouseman is responsible for filing any loss-in-transit claims against the carriers.

"(ii) In settling for differences in quality, values shall be determined on the basis of domestic cash prices current in the applicable terminal market as of the date of acceptance by the carrier of the final shipment under the applicable loading order * * *: Provided, however, that if any of the grain loaded out grades sample (unless called for on the loading order) and CCC sells such grain promptly, the discount applied in making settlement shall be the difference between the net sales proceeds of the sample grade grain and the value, as of the date of sale, of the grain which should have been delivered. The value of any under-delivery in quality shall be paid immediately to CCC by the warehouseman in cash, except to the extent that the amount thereof is offset by the value of any unapplied overdeliveries in quality for the same kind of grain established not earlier than the beginning of the third calendar

year prior to the calendar year during which the underdelivery in quality was established. Any such payment made by the warehouseman to CCC shall be refunded by CCC to the extent that the value of the underdelivery in quality for which such payment was made is offset by the value of any overdeliveries in quality for the same kind of grain established not later than the end of the third calendar year following the calendar year during which the underdelivery in quality was established. * * * The value of any overdeliveries in quality, or of any cash payments for underdeliveries in quality, not offset or refunded in the manner and within the period set forth above, or as of the date of termination of this agreement, whichever is earlier, shall be dropped and no allowance or payment of any kind with respect thereto shall be made to the warehouseman. For the purpose of this subsection, the execution of a revised Uniform Grain Storage Agreement superseding this agreement shall not be construed as a termination of this agreement."

tlement thereunder, arose between the parties until the final load-out of Plaintiffs' warehouses. The record discloses that in the early part of 1962 Commodity ordered all of Plaintiffs' warehouses emptied, surrendered the warehouse receipts, and issued loading orders for shipment of all remaining Government-owned wheat from those warehouses. At that time Plaintiffs failed to deliver the quantities of wheat called for by the warehouse receipts and, as a result, substantial shortages of Government owned wheat became apparent. There is no dispute as to these shortages, as Plaintiffs have admitted them by stipulation.

The factual basis for the Government's counterclaims is set forth in its exhibits "B".[2] A summary of these exhibits reflects the following:

| Warehouse | Bu. ordered shipped by CCC | Bu. loaded out and actually delivered to CCC | Amount of actual shortage or under delivery | Counterclaims by CCC |
|---|---|---|---|---|
| Tulsa Grain Storage Co. | 240,167.87 | 214,615.96 | 25,551.91 | $64,033.59 |
| Sapulpa Grain Storage Co. | 384,362.32 | 367,035.39 | 17,326.93 | 35,689.02 |
| Reading Grain & Storage Co. | 184,219.46 | 160,228.02 | 23,991.44 | 35,449.24 |
| Scherer Grain Storage Co. | 147,513.28 | 139,809.08 | 7,704.20 | 16,925.87 |
| Dewey Grain Co., Inc. | 187,609.51 | 184,047.81 | 3,561.70 | 8,572.07 |
| Triplett Grain & Storage Co. | 81,116.92 | 66,859.37 | 14,257.55 | 30,255.66 |
| E. & E. Grain Storage Co. | 75,032.35 | 71,884.27 | 3,148.08 | 10,193.45 |
| W. J. Lamberton Warehouse | 425,326.59 | 416,807.41 | 8,519.18 | 18,265.41 |
| J. F. W. Company | 423,105.76 | 411,959.78 | 11,145.98 | 29,244.22 |

The Court finds that these counterclaims have been computed strictly in accordance with the settlement provisions of Section 13 of the contracts. The formula for settlement as prescribed therein is the "differences in value between the *grain loaded out* by the warehouseman and the *grain ordered shipped* by Commodity Credit Corporation." Thus the exhibits summarized above provide a basis for determination of liability under the contracts.

Plaintiffs are seeking an interpretation of the contract granting credit for loss of moisture from the wheat while in shortage. In support of their case, Plaintiffs presented two witnesses, both of whom testified that their elevators did not deliver back the same amount of grain as delivered to them because of moisture loss due to methods of ventilation which dried out the grain. Plaintiffs then moved to admit into evidence copies of the original contracts, a sum-

2. As to the Plaintiff, Oologah Feed Company, a measurement of the inventory in its warehouse disclosed a measured deficiency of 16,243 bushels on December 13, 1962. Upon demand from Commodity, this Plaintiff paid Commodity $34,213.- 23 representing the value of the claim shown by the outstanding warehouse receipts, and redeemed these receipts. Commodity did not file a counterclaim against this Plaintiff.

mary of the loading orders, warehouse-man's bonds, and stipulations. This was the extent of Plaintiffs' case against Commodity.

Plaintiffs contend in their reply to Commodity's counterclaims that they delivered the same number of "kernels" back to Commodity as was originally delivered to them, minus a certain amount of moisture. But, as disclosed above, the contracts do not provide for settlement on the basis of "kernels" of wheat, but rather on the basis of official weights and grades, as provided in paragraphs 12 and 13 of the Uniform Grain Storage Agreement. Therefore, it is the determination of the Court that Plaintiffs failed to sustain the burden of proof which would entitle them to relief by way of declaratory judgment.

Under the Uniform Grain Storage Agreement entered into between all of the Plaintiffs and the Commodity Credit Corporation, there is a distinction between grain stored on (1) a commingled basis, and (2) an identity preserved basis. In the interpretation of this contract, the Court must recognize this distinction and determine the responsibilities and liabilities of the parties on the basis of such distinction.

By the agreed definition of the term "Identity Preserved", found in Section 19 (m) of the contract, it is apparently the intent of the parties that where grain is stored *identity preserved,* the warehousemen are to maintain and redeliver to Commodity the identical grain stored; or, in other words, the same grain that was delivered in the first instance for storage. Furthermore, where grain is stored "identity preserved" the warehouse receipts must be marked so as to indicate that the grain is stored identity preserved. This identification would disclose to the holder of the warehouse re-ceipts that his rights would be determined on that basis.

The liability of a warehouseman with respect to identity preserved grain is found in Section 13(d) of the contract.[3] Therein it expressly provides that a warehouseman shall not be liable for shrinkage or loss of moisture when grain is stored identity preserved. It is significant, in the opinion of the Court, that no such provision exists with respect to commingled grain. Had the parties intended that credit be allowed for shrinkage of commingled grain, it would seem that the contract would have so provided, as it did in the case of identity preserved grain.

The contract deals with two distinct methods of storing grain. It would seem illogical to assume that the parties intended to apply shrinkage credit to both types since the contract expressly provided for shrinkage applicable to only one, namely, identity preserved. The interpretation to be given to the action of the parties in expressly providing in one instance and expressly omitting in the other is akin to the rule of statutory construction "inclusio unicus est exclusio alterius", that is, by deliberately including the credit for shrinkage in connection with identity preserved storage and then omitting it from commingled storage, the parties have manifested their intent that no credit should be given for shrinkage of commingled grain.

Plaintiffs have not claimed that they were storing wheat for the Government under the provisions of the contracts relating to identity preserved grain. To the contrary, they have stipulated that all the wheat in question was being stored on a commingled basis. Accordingly, none of the Plaintiffs are entitled to avail themselves of the defense of natural

---

3. Section 13(d) of the contract provides in pertinent part as follows:
    "In settling for load out of the grain which is stored identity preserved, * * * the warehouseman shall be liable for any failure to deliver the gross quantity of the identical grain received, ex-cept that the warehouseman shall not be liable if he establishes that such under-delivery in quantity resulted from natural shrinkage if such grain was stored in sealed bins under the supervision of a disinterested custodian * * *"

shrinkage which the contract provides for in the case of identity preserved grain.

■ The contracts under consideration here are not ambiguous, but plainly cast upon Plaintiffs the liability of an insurer with regard to redelivery to Commodity of the quantity and quality of grain originally deposited for storage on a commingled basis. The Courts, in construing the Uniform Grain Storage Agreement, have affirmed this liability, and have held the surety on the warehouseman's bond to be likewise liable. United States v. Farmers Seed and Feed Co., 181 F.Supp. 475 (D.C.1959); St. Paul Mercury Indemnity Co. v. United States, 201 F.2d 57 (10th Cir. 1952) Farmers Grain, Livestock and Cooperative Mercantile Association, Inc. v. Commodity Credit Corporation, 145 F.Supp. 788 (D.C.1956). Insofar as they are applicable here, this Court will be guided by those decisions.

In United States v. Farmers Seed and Feed Co., supra, the Court had under consideration the liability of a warehouseman under the Uniform Grain Storage Agreement. At page 479, Judge Bootle stated:

"I turn now to the agreement between the parties to determine the defendant warehouseman's liability, if any, for the loss of Commodity's grain. Although a warehouseman is generally liable only for failure to exercise ordinary care, he may increase his liability by contract. Farmers Grain, etc., Ass'n v. Commodity Credit Corp., D.C.Kan.1956, 145 F.Supp. 788; Blair v. United States, 5 Cir., 1947, 164 F.2d 115; 111 Ga.Code Ann. sec. 423. Defendant warehouseman has so increased its liability by the terms of the Uniform Grain Storage Agreements. Paragraph 11(j) of the agreement provides:

" 'Except to the extent that such liability is limited by the provisions of sections 10 and 15 and of this section 11, the warehouseman shall be liable as an insurer and indemnify Commodity as provided in section 13 for any failure to load out or deliver grain meeting the requirements of this section.'

"None of the exceptions to the liability of the warehouseman as an insurer is applicable under the facts of this case. Thus, defendant warehouseman is liable to plaintiff for its failure to deliver the oats called for by the load-out order."

In that case, because of spoilage, the defendant warehouseman delivered a lesser quantity of grain than deposited by Commodity. The language of that court is particularly applicable here, however, in that the result was the same; the warehouseman was unable to deliver the quantity of grain called for by the warehouse receipts, and was thus liable for the amount of the underdelivery.

■ As authority for the statement that a warehouseman may increase his liability by contract, Judge Bootle cited Farmers Grain, etc., Ass'n v. Commodity Credit Corp., 145 F.Supp. 788 (D.C.Kan. 1956). Both Kansas and Georgia have adopted the Uniform Warehouse Receipts Act, which expressly provides that a warehouseman may increase his liability by agreement. At the time the contract was entered into, the Uniform Warehouse Receipts Act was also in effect in Oklahoma. (2 Okla.Stat.1955 § 9–61 et seq.) [4] Section 9–80 of the Oklahoma Act expressly recognizes that a warehouseman may increase his liability. By executing the Uniform Grain Storage Agreement, the Plaintiffs have increased their liability to that of an insurer under Oklahoma law and in accordance with Paragraph 11(j) of their contracts.

■ As insurers, Plaintiffs have contracted to assume all risks while the wheat was in their possession under the grain storage contract, including the risk of shrinkage and other operational losses. This is the nature of a contract of insurance and indemnity.

4. Repealed, 1961. Now covered by Uniform Commercial Code 12A Okla.Stat. § 7–204.

■ Testimony received at the trial established that wheat, by custom, is weighed-in and weighed-out and settlements are made for the differences in the number of pounds. It was further established that shrinkage and other losses in connection with care of the grain are risks of the business and are assumed by the warehouseman. It is a fundamental proposition in the grain trade that the liability of a warehouseman is determined by the number of pounds shown on negotiable warehouse receipts which he issues and the grades reflected thereon. This is not only custom, but is also the law in Oklahoma. (2 Okla. Stat.1955 § 9–27) This statute provides that each warehouseman in Oklahoma shall "upon weighing commodities, issue to the person from whom the same are received a scale ticket in a form or forms approved by the State Board of Agriculture. Such scale ticket shall be nonnegotiable, but may * * * be exchanged for negotiable warehouse receipt, either State or Federal."

Plaintiffs admit that they would settle on the basis of weights with a farmer and give him back the same number of pounds of wheat shown on the farmer's negotiable warehouse receipt, and that under Oklahoma law they would honor a warehouse receipt held by anyone other than the Government by delivering the exact number in pounds of wheat called for on the warehouse receipt. Yet, they deny that the Government has the same right. They seem to contend that by their contract with the Government they have decreased their liability. The Court is unable to find any provision, either statutory or contractual, which makes liability to the Government under a warehouse receipt any less than the liability to a private person.

The record discloses that the quality of grain, which is the basis for fixing its value, is determined on the basis of official grades set by the United States Department of Agriculture. The determination of the quality of grain has nothing whatsoever to do with the determination of quantity. As the Court has

noted before, if moisture content is considered at all, it is considered in determining official grades. Moisture content has nothing to do with determining weight. Thus, in construing a contract whereunder Plaintiffs agreed to deliver back to Commodity a certain *quantity* of grain, the Court will not consider moisture content in determining contractual liability.

Plaintiffs have stipulated that Exhibits "B" are accurate computations of the Government's counterclaims, and that they are based on calculations made in accordance with Section 13. They show the amounts for which Plaintiffs have contracted liability as an insurer, and under Section 11(j) Plaintiffs have agreed to indemnify Commodity for such amounts. Having contracted as an insurer to indemnify Commodity for such amounts, Plaintiffs cannot plead shrinkage from moisture loss as a defense.

In United States v. Luther, 225 F.2d 499 (10th Cir. 1955), cert. denied, 350 U.S. 947, 76 S.Ct. 321, 100 L.Ed. 825 (1956), Judge Phillips stated:

"Where the parties to a contract have given it a practical construction by their conduct, such construction is entitled to great weight in determining its proper interpretation, especially where such practical construction occurred before any controversy arose."

The parties had given this contract a practical construction by their conduct before the controversy arose. The record shows that the Government paid Plaintiffs warehouse charges on the basis of the quantity of wheat delivered for storage under the storage contract as reflected by the warehouse receipts. At no time did the Plaintiffs offer to reduce the warehouse charges on the basis of alleged shrinkage of the product which they received for storage.

■ Furthermore, the testimony establishes that before this controversy arose Commodity had issued loading orders to the Plaintiffs to load out and ship certain quantities of wheat, and

that these loading orders had been settled in accordance with the terms of the Uniform Grain Storage Agreement. Such settlements were made on the basis of official weights and grades, and were computed in the same manner as were the claims of Commodity against Plaintiffs in the present action. The Plaintiffs' failure to reduce their warehouse charges, and to object to the settlement of prior loading orders, indicates a practical construction of the contract by the parties. This course of conduct is entitled to great weight in determining the proper interpretation of the Uniform Grain Storage Agreement.

The record shows that there are two storage rates for wheat under the Uniform Grain Storage Agreement. For identity preserved wheat the storage rate is 32 thousandths of a cent per bushel per day, as opposed to the considerably higher figure of 37 thousandths of a cent per bushel per day, which is the storage rate for commingled wheat. As discussed herein, Plaintiffs would not be liable for natural shrinkage of wheat stored on an identity preserved basis under the conditions prescribed by the contract.

Mr. Robert B. Baird, Claims Officer, Commodity Credit Corporation, testified that the wheat was stored with Plaintiffs for approximately two years. Accordingly, it appears that Plaintiffs were paid over $200,000.00 more for the storage of the commingled wheat than they would have been paid had they stored it identity preserved. It is manifest from the difference in storage rates that the parties intended that the higher rate for commingled grain would compensate the warehouseman for the risks involved, including the risk of shrinkage.

Construing the Uniform Grain Storage Agreement as a whole, and giving effect to each provision thereof, it is the opinion of this Court that Plaintiffs are not entitled to a declaratory judgment against Commodity, nor to any credit for shrinkage of Commodity's wheat while it was in their care. It is the further opinion of the Court that Commodity is entitled as a matter of law to judgments on its counterclaims against the Plaintiffs and their surety companies.

Relying on St. Paul Mercury Indemnity Co. v. United States, 201 F.2d 57 (10th Cir. 1952), the Government asks for interest at six percent per annum on its counterclaims from the stop-storage dates in Finding of Fact No. 14, entered with this opinion. That case is distinguished from the case at bar, however, in that only the amount, and not the fact of liability was in dispute. The Court believes that in the case at bar a justiciable controversy existed between the parties, and that Plaintiffs in good faith prosecuted their cause of action to obtain a judicial construction of the Uniform Grain Storage Agreement. Therefore, in the exercise of its sound discretion, the Court will award the Government interest on that portion of its counterclaims which were not disputed by Plaintiffs from the appropriate stop-storage date; as to the amount of the counterclaims in dispute, the Court will award the Government interest at six percent per annum from the date of Judgment.