**FARMERS ELEVATOR MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**Pat H. STANFORD, dba Bardwell Grain Company, and Millers Mutual Fire Insurance Company of Texas, Defendants.**

**Civ. A. No. 4-432.**

United States District Court
N. D. Texas,
Fort Worth Division.
Dec. 7, 1967.

---

J. Edward Barth, of Barefoot, Moler, Bohanon & Barth, Oklahoma City, Okl., for plaintiff.

David M. Kendall, Jr., of Woodruff, Hill, Bader & Kendall, Dallas, Tex., for defendants.

## OPINION

WILLIAM M. TAYLOR, Jr., District Judge.

Plaintiff Farmers Elevator Mutual Insurance Company, claiming as subrogee of Commodity Credit Corporation (hereinafter referred to as "CCC") brought this suit against Defendant Pat H. Stanford, dba Bardwell Grain Company, and Defendant Millers Mutual Fire Insurance Company of Texas to recover the sum of $23,342.88 (reduced by trial amendment to $22,964.24), being the amount plaintiff had paid to CCC under its blanket insurance policy FE–475. The case was tried before a jury, but at the conclusion of the evidence plaintiff moved for an instructed verdict and the court, being of the opinion that the established and uncontroverted facts as hereinafter set forth determined the rights of the parties, withdrew the case from the jury and has concluded that judgment should be rendered for the plaintiff.

Defendant Pat H. Stanford, operating warehouses located at Bardwell and Morgan, Texas, entered into a Uniform Grain Storage Agreement (hereinafter referred to as "UGSA"), with CCC on June 30, 1960, agreeing to accept grain and other commodities for storage, issu-ing warehouse receipts and certificates and loading out such stored grain and other commodities in accordance with the terms and provisions thereof.

On June 5, 1962, Defendant Stanford, as Principal, and Defendant Millers, as Surety, executed Standard Warehouseman's Bond No. 18–18–84, binding themselves "unto Commodity Credit Corporation and to any agency *or person* who may be injured by a breach of the Agreement(s) thereinafter described" (emphasis added), in the principal sum of $130,-000.00. It was further provided that "This bond shall be effective from the effective date of such Agreement(s) * * *." By rider, the date of the bond was made August 8, 1962 and by another rider the penal sum of the bond was increased from $130,000.00 to $185,000.00, it being provided in said rider that such change should be effective on and after August 8, 1962 and should not affect the rights and obligations of the parties under the bond prior to the change, except as to limit of liability.

Defendant Stanford had applied for and secured a license from the State of Texas under the provisions of Article 5577a, Revised Civil Statutes of Texas, being the Texas Grain Warehouse Act. Pursuant to Section 3 thereof, and to obtain such license for the Bardwell facility, Defendant Stanford and Defendant Millers executed bond in the penal sum of $50,000.00 and a like bond in the amount of $30,000.00 for the Morgan facility, which said bonds were conditioned upon the faithful performance of all of Bardwell's duties as public warehouseman.

CCC deposited grain in these warehouses for commingled storage under the UGSA. Stanford accepted the grain for storage and duly issued warehouse receipts, as provided by Section 9(a) (1) of the Agreement, and CCC paid the warehouse charges to Defendant Stanford on the basis of the quantity of grain delivered for commingled storage thereunder.

On June 17, 1963, plaintiff executed and delivered to CCC its blanket Insurance Policy FE–475, agreeing to pay CCC

any and all amounts which CCC should be entitled to recover from any warehouseman because of any failure of the warehouseman to perform fully its obligations under the UGSA during the term from July 1, 1963 to July 1, 1964. Paragraph 10 of this insurance policy provided that in the event of any payment under the policy the insurer should "to the full extent permitted by law, be subrogated to all of CCC's right of recovery therefor against the warehouseman and any other person or other legal entity to the extent of such Agreement."

On July 1, 1963, CCC and Defendant Stanford amended the UGSA by executing Bond Amendment to UGSA which provides, *inter alia*, (1) that acquisition of the blanket insurance policy by CCC does not relieve the warehouseman of any obligations under the Agreement; (2) that the insurance does not inure to the benefit of the warehouseman; and (3) that by payment to CCC under the policy plaintiff-insurer is subrogated to CCC's right to recover against warehouseman and any other person or legal entity to the extent of such payment. The Bond Amendment also provided that the warehouseman should pay CCC a charge as specified in a Schedule for Rates for all warehouses covered by the UGSA for which CCC was protected by a blanket insurance policy, such charge to be paid upon the receipt of invoice from CCC showing the amount due and further providing that CCC might collect such amount by setoff against the charges due and unpaid the warehouseman under the UGSA.

Commencing in February of 1963 and continuing through September 1963, CCC surrendered warehouse receipts and issued loading orders to Defendant Stanford to load out and ship all of the grain remaining in storage in Stanford's warehouses. Defendant Stanford failed and refused to redeliver all of the grain stored by CCC in the quantity and quality shown on the warehouse receipts. CCC made demand upon Defendant Stanford for payment of the full amount owing, $23,324.88. On September 25, 1964, pursuant to the terms of its blanket in-

surance policy, plaintiff was compelled to and did pay CCC the sum of $23,324.88. On December 29, 1964, interest was paid by plaintiff to CCC in the amount of $1,412.08. Plaintiff, as subrogee of CCC, under its blanket insurance policy and the Bond Amendment to the UGSA, made demand for payment from both defendants. Upon their refusal, this action resulted.

The evidence shows that prior to July 1, 1963, CCC, as part of its routine movement of grain and under the UGSA, issued three loading orders to Stanford. Stanford failed to deliver grain of the quantity and quality called for by the warehouse receipts surrendered by CCC with demand for delivery of the grain described on such receipts. Settlement for the value of the grain shipped was calculated in accordance with Section 13 of the UGSA and is $1,536.20. These loading shortages were considered by CCC as usual and ordinary for warehouses without weighing and grading facilities.

The record discloses that prior to July 1, 1963 Stanford earned $2,961.87 in unpaid warehouse charges pursuant to Section 18 of the UGSA. CCC set off the shortage from the routinely issued loading orders described above by the accrued warehouse charges in the claim in accordance with Section 23(b) of the UGSA. This resulted in a net credit to Stanford of $1,425.67, which is properly applied against the ultimate claim.

On April 25, 1963, CCC removed Stanford's warehouses from the List of Approved Warehouses because of his failure to furnish a financial statement. CCC did not terminate the agreement at that time in accordance with its rights under Section 22(b) of the UGSA. This action was merely notice to Stanford that CCC would not deposit additional grain in his warehouses.

On July 23, 1963, CCC decided to issue loading orders to ship the entire quantity of government owned grain in store at Stanford's warehouses, presumably because he had failed to submit a financial statement.

Stanford failed to deliver the quantities of grain called for by the warehouse receipts surrendered by CCC with demand for delivery of the grain described on such receipts. The last date on which storage charges were to end was September 25, 1963. Settlement was made pursuant to Section 13 of the UGSA with the total net value of the underdeliveries and overdeliveries in the quantity and quality of the grain shipped, resulting in a shortage of $34,339.74.

The last shipment of the government owned grain stored in Stanford's warehouses was made on December 6, 1963.

The official weights and grades of all grain loaded out by Stanford and shipped to CCC was determined at the destination in accordance with Section 12 of the UGSA.

The accrued but unpaid warehouse charges on the final shipments total $10,886.24. This amount is properly included as a credit in the claim.

The total claim as computed by CCC was $23,342.88. Due demand for payment of this amount was made by CCC upon Stanford and Defendant Millers. When Stanford and Defendant Millers refused to make payment, demand was made upon plaintiff under its blanket insurance policy.

Pursuant to the terms of its blanket insurance policy, plaintiff was compelled to pay CCC $23,342.88, plus interest thereon. From the records of CCC produced upon the trial, including the warehouse receipts, load out orders, weight certificates, and bills of lading, it appeared that the provable shortage amounted to $22,964.24 and the claim of Plaintiff Farmers was reduced to this amount by trial amendment.

■ Section 21 of the UGSA specifically provides that its terms " * * * shall prevail over the written or printed terms of the warehouse receipts representing the grain, * * * and over state and local regulatory laws and rules *to the extent that such laws or rules may be inconsistent herewith."* It is, therefore, unquestionable that the rights and duties of the parties in respect to the grain involved in this controversy are governed by the terms of the UGSA. See, Tulsa Grain Storage Co. v. Commodity Credit Corporation, 231 F.Supp. 432, 433 (N.D.Okl.1964); Farmers Grain, Livestock and Cooperative Mercantile Association v. Commodity Credit Corporation, 145 F.Supp. 788, 795 (D. Kan.1956).

Throughout the UGSA significant distinction is made between grain stored "commingled" and "identity preserved". Recognition of this distinction is fundamental to an interpretation of the Agreement in the determination of the responsibilities and liabilities of warehousemen and their sureties. Plaintiff and Defendant Millers have stipulated that grain deposited by CCC in Stanford's facilities was stored "commingled".

The UGSA imposes absolute liability on the warehouseman. Under the plain and unambiguous terms of the Agreement defendants are insurers of the quantity, measured by official weights, and quality, determined by official grades of grain stored on a commingled basis and Defendants are liable to CCC for any underdeliveries or shortages either in quantity or quality.

■ The courts, in construing the UGSA, have held the warehouseman to be an insurer under its express terms, that the warehouseman is liable for failure to redeliver to CCC the quantity and quality of grain that was originally deposited for storage on a commingled basis, and that the surety on the warehouseman's bond was likewise liable. See United States v. Pyle, 248 F.Supp. 40 (E.D.Okl.1965); Tulsa Grain Storage Co. v. Commodity Credit Corporation, supra; United States v. Farmers Seed and Feed Company, 181 F.Supp. 475 (M.D.Ga.1959); St. Paul Mercury Indemnity Co. v. United States, 201 F.2d 57 (10 Cir. 1952); Farmers Grain, Livestock and Cooperative Mercantile Association v. Commodity Credit Corporation, supra.

In effect in Kansas, Georgia and Oklahoma, during the applicable periods in Farmers Grain, Livestock and Cooper-

ative Mercantile Association v. Commodity Credit Corporation, supra, and Tulsa Grain Storage Co. v. Commodity Credit Corporation, supra, respectively, was Section 21 of Article 5632 of the Texas Revised Civil Statutes.

In each of the above cases the courts interpreted this statute which provides in presently pertinent part that the warehouseman is liable for failure to exercise reasonable care " * * * *in the absence of an agreement to the contrary * * *.*" The UGSA was unanimously held to be an agreement in which the warehouseman has increased his liability. It makes no difference whether the bonds are state or CCC, the liability of Millers is the same. All the bonds are conditioned upon performance of the UGSA and incorporate its terms and provisions. Therefore, under the terms of the Agreement and by virtue of its bonds, Defendant Millers is liable for Stanford's failure to load out grain of the quantity and quality deposited for commingled storage by CCC. See, United States v. Pyle, supra; Tulsa Grain Storage Co. v. Commodity Credit Corporation, supra, 231 F.Supp. at 438; United States v. Farmers Seed and Feed Company, supra; St. Paul Mercury Indemnity Co. v. United States, supra, 201 F.2d at 61; United States v. Merchants Mutual Bonding Company, 220 F.Supp. 163 (N.D.Iowa 1963); United States v. Tyler, 220 F. Supp. 386 (N.D.Iowa 1963); Farmers Grain, Livestock and Cooperative Mercantile Association v. Commodity Credit Corporation, supra.

Defendant Millers, as a defense to this suit, asserts that plaintiff was not subrogated to the rights of CCC to recover against the warehouseman "to the extent of payment" by plaintiff-insurer because Defendant Millers is a co-insured with CCC. These contentions are without merit. Section 20 of the UGSA was amended by the Bond Amendment which provides:

"Requiring of a blanket insurance policy or blanket bond by CCC shall not relieve the warehouseman of any of his obligations under the UGSA, nor shall any insurance policy or bond inure to the benefit of the warehouseman. If the insurance company or surety company providing blanket coverage to CCC pays any amounts to CCC for which the warehouseman is liable, such company shall, to the extent permitted by law, *be subrogated to CCC's rights of recovery against the warehouseman and any other person to the extent of such payment.*" (Emphasis supplied.)

Thus, this Bond Amendment was not only notice to Stanford, but was Stanford's agreement that he was not a co-insured of the contemplated blanket policy.

According to the terms of both the blanket insurance policy executed by CCC and plaintiff, and the Bond Amendment to the UGSA executed by CCC and Stanford, plaintiff is subrogated to CCC's right of recovery against Stanford and any other person or legal entity to the extent of such payment by plaintiff-insurer. (See: Order, Farmers Elevator Mutual Ins. Co. v. Jorski Mill & Elevator Co., Inc. and Millers Mutual Ins. Assn. of Illinois, 259 F.Supp. 755 (W.D.Okl., 1966).

Defendant Millers takes the position that plaintiff, by paying CCC, did so as a volunteer and is not entitled to be subrogated to CCC's right of recovery against Stanford and Millers.

All parties are bound by Stanford's agreement with CCC that plaintiff is entitled to subrogation upon payment. This agreement is embodied in the Bond Amendment to the UGSA which amends Section 20(a).

"If the insurance company or surety company providing blanket coverage to Commodity Credit Corporation pays any amounts to Commodity Credit Corporation for which the warehouseman is liable, such company shall, to the extent permitted by law, be subrogated to Commodity Credit Corporation's right of recovery against the warehouseman and any other person to the extent of such payment."

This same right to subrogation is spelled out in almost identical language in Section 10 of the blanket insurance policy executed between CCC and plaintiff.

It is appropriately significant that the Fifth Circuit, in Yonack v. Interstate Securities Company of Texas, 217 F.2d 649, 651 (5th Cir., 1955), was moved recently to make the following statement concerning subrogation in Texas:

"The courts in Texas have been peculiarly hospitable to the right of subrogation and have been in the forefront in upholding the right to it. In Faires v. Cockerell, 88 Tex. 428, 31 S.W. 190, 191, 194, 639, 28 L.R.A. 528, Judge Brown declared:

'Perhaps the courts of no state have gone further in applying the doctrine of subrogation than has the court of this state,'

and later decisions have followed this lead."

See, also, 53 Texas Jurisprudence 2d, Subrogation, §§ 46–48; Southwestern Indemnity Company v. National Surety Corporation, 277 F.2d 545, 549 (5th Cir., 1960); Commercial Standard Ins. Co. v. American Employers Ins. Co., 209 F. 2d 60 (6th Cir., 1954). This position of the defendant is contrary to case law and particularly Texas jurisprudence.

Defendant Millers also urges that the policy of insurance issued by Farmers to CCC was additional and concurrent to the warehouseman's bond issued by Millers to Stanford with the result that Farmers and Millers are co-sureties. Consequently, under the doctrine of contribution any loss of Stanford to CCC must be prorated between Farmers and Millers on the basis of the total coverage undertaken by each.

■ It is the law that ordinarily where there is more than one surety, that they are co-sureties and there is contribution among them. This right of contribution arises from equitable considerations. "The basis of the right was natural justice, that equality was equity, and that sureties were presumed to agree that all would contribute to the common loss caused by the principal's default."

Simpson, Suretyship, p. 239; Farmers Elevator Mutual Insurance Co. v. Jorski Mill & Elevator Co. Inc., supra.

But the facts of this case show that plaintiff did not agree to "contribute to the common loss." Plaintiff agreed to bear the burden of payment of the entire loss if CCC could not collect without suit. (Blanket Policy, Section 8.) Plaintiff also bargained for and obtained the right of subrogation "to all of CCC's rights of recovery therefor against the warehouseman *and any other person or other legal entity.*" (Blanket Policy, Section 9.)

■ Under the evidence in this case, the court finds that Farmers was and is a sub-surety to Millers and not a co-surety and is not liable in contribution. Therefore, the claim of contribution between co-sureties as urged by defendants is found to be without merit and inapplicable to this case.

This cause of action is not barred by any statute of limitations. Plaintiff's cause of action did not accrue until September 25, 1964 upon its payment to CCC. CCC's cause of action did not accrue until the amount of shortage was determined on December 6, 1963, the date the last shipment was made.

In National Cotton Oil Co. v. Taylor, 45 S.W. 478 (Tex.Civ.App.1898), the court held that the statute of limitation begins to run not when the seed was sold, but when it was weighed and the amount ascertained. Similarly, the courts in St. Louis Southwestern R. Co. of Texas v. Davy Burnt Clay Ballast Co., 288 S.W. 855 (Tex.Civ.App.1926) and Stribling v. Moore, 33 Tex.Civ.App. 297, 76 S.W. 593 (1903), have held that the essential point in time is the date of measurement.

■ Plaintiff had no cause of action until compelled to pay CCC and the limitation did not begin to run against plaintiff until that time. In Stanolind Oil & Gas Co. v. Allison, 121 S.W.2d 480 (Tex. Civ.App.1938), after the lessor failed to pay the State of Texas its share of the bonus under a lease executed pursuant to the Relinquishment Act, the State re-

ceived its share from the lessee. The court held that the four-year statute of limitations started running after the date of the lessee's payment to the State. As is plaintiff here, the lessee in *Stanolind* was subrogated to the State's right against the lessor. It was on September 25, 1964, that plaintiff paid CCC. On that date, plaintiff's cause of action accrued and the statute of limitations began to run. See, Maryland Casualty Co. v. Fidelity & Casualty Co., 147 S.W.2d 1097 (Tex.Civ.App.1941); and Hammond v. Myers, 30 Tex. 375 (1867). Plaintiff filed this action after a brief lapse of time and would still have ample time within which to file any action based on its rights attained by payment to CCC.

▮ By the very terms of not only the licensed warehouse bonds given to the State of Texas, but also of the warehouseman's bonds binding themselves to CCC and to any agency or person who might be injured by a breach of the Agreement, the losses are within the coverage thereof. The bond given to CCC was effective from the effective date of the UGSA. The obligation undertaken by Millers was one continuing until cancelled in accordance with the terms of the bond. Surely the obligation of the bond was breached upon the failure to load out grain in sufficient quantities and qualities as shown on the warehouse receipts surrendered to Stanford.

In Hartford Accident and Indemnity Company v. State of Kansas, 247 F.2d 315 (10th Cir., 1957), the court was faced with the question of whether a depositor's losses occurring, even known and discovered, prior to issuance of a similar state bond were covered. The court held that the losses were within the coverage of the bond because of the warehouseman's failure to deliver after the execution of the bond. There, a warehouse examiner discovered a shortage and CCC, a depositor, required the warehouseman to furnish an additional bond. The warehouseman made application for the additional bond and it was approved by the surety. The court acknowledged

that even though the warehouseman made false representations to the surety, this did not prevent CCC from recovering on the bond. The court, at page 321, held that a depositor would have a claim against a warehouseman " * * * only when a demand for the return of a deposited grain was dishonored." The court conclusively stated, at 322, that:

"So also must fail the contention that the $50,000 bond was prospective and did not cover losses which had already occurred. The obligation of the bond was 'Now, therefore, if said principal shall well and faithfully perform all of his duties as such Public Warehouseman, then this obligation to be void and of no effect; otherwise to be and remain in full force and effect.' The obligation of the warehouseman covered by the bond was 'to deliver the grain upon a demand made either by the holder of a receipt for the grain, or by the depositor * * *' This was a prospective obligation and arose in this case after the execution of the bond. [The warehouseman] breached this obligation by failing to deliver the wheat upon demand, and since the appointment of a receiver obviated the necessity of a demand, the obligation was breached when the receiver was appointed."

As in this case, the bond provided for the faithful performance of the duties and obligations of the warehouseman. In both instances, the obligation was breached upon the failure to load out the grain. The Court of Appeals in *Hartford* goes even farther than is necessary in this case because there the loss was discovered prior to the execution of the bond, whereas here the loss was not discovered until September 1963, during the term of the bond.

▮ The fact that the losses may have occurred prior to the term of the bond has no effect because in *Hartford*, at 318, it was specifically found that during some of the time not covered by the bond, the warehouseman was " * * * indebted to Commodity on warehouse receipts and contracts for more wheat than

he had on hand." The key point in time as determined by the court in *Hartford* is the date of refusal. See National Cotton Oil Co. v. Taylor, supra; St. Louis Southwestern R. Co. of Texas v. Davy Burnt Clay Ballast Co., supra; and Stribling v. Moore, supra. Stanford was obligated under the UGSA to load out the grain when demanded by CCC. This he failed to do thereby making Millers jointly and severally liable with him under the bond.

▉▉▉▉▉ In accordance with Section 8 of the UGSA, Stanford issued his negotiable warehouse receipts to CCC on the basis of official weights and grades at the point of origin from which the grain was shipped. Upon determination of official weights, weight certificates were issued by Stanford showing the exact hundred-weight of the grain, and the warehouseman entered this amount upon the warehouse receipts. The grades of grain were also shown upon the warehouse receipts. Official grades are determined in accordance with United States Grain Standards Act and the regulations issued thereunder. 7 U.S.C. § 71 et seq. "Under the grain standards regulations, appeals may be taken from official determinations of grades, and failure to exhaust this administrative remedy precludes any collateral attack upon the grade determination. Farmers Coop. Elevator Company v. Commodity Credit Corporation, 144 F.Supp. 65 (D.C.S.D. 1956); Elbow Lake Coop. Grain Co. v. Commodity Credit Corporation, D.C. Minn., 144 F.Supp. 54, affirmed 8 Cir., 251 F.2d 633." Tulsa Grain Storage Co. v. Commodity Credit Corporation, supra, 231 F.Supp. 434. See also, Farmers Coop. Elevator Co. v. Commodity Credit Corporation, 144 F.Supp. 65 (D.S.D.1956). As in the *Tulsa* case, Stanford at no time objected to or appealed from the determination of official weights or official grades. Rather, in both instances,

negotiable warehouse receipts were issued on the basis of official weights and grades and the warehouseman thereby contracted to redeliver the same quantity and quality to CCC upon demand. Defendant Millers cannot now question the validity of the warehouse receipts. Furthermore, Millers cannot now question the weights and grades upon which settlement was determined. See Elbow Lake Coop. Grain Co. v. Commodity Credit Corporation, supra.

▉▉▉ The claims of CCC are liquidated in that on December 6, 1963 the quantity of grain not delivered by Stanford to CCC was definite and certain, and its value was also capable by calculation of being ascertained. The right to recover the value of the grain vested on December 6, 1963. The obligations of Millers to CCC on the bonds issued for Stanford likewise vested on that date and the amount of the obligation payable by Millers was likewise liquidated, definite and certain on that date. Plaintiff is entitled to interest on the claim at six per cent (6%) from December 6, 1963. (See: Evans Production Corp. v. Shaw, 276 F.2d 313 (5th Cir. 1960); Routon v. Phillips, 246 S.W.2d 223 (Tex.Civ.App. 1952); Federal Life Ins. Co. of Chicago v. Kriton, 112 Tex. 532, 249 S.W. 193 (1923); American Nat. Ins. Co. v. Fulghum, 177 S.W. 1008 (Tex.Civ.App.1915); Great Eastern Casualty Co. v. Anderson, 183 S.W. 802 (Tex.Civ.App.1916); and Order, Farmers Elevator Mutual Insurance Co. v. Jorski Mill & Elevator Co., Inc. and Millers Mutual Ins. Association of Illinois, 259 F.Supp. 755 (W.D.Okl. 1966).)

Accordingly, judgment is rendered for plaintiff against defendants [1] for the sum of $22,964.24, with interest thereon at the rate of six (6%) per cent per annum from the 6th day of December, 1963 until paid, and for all costs of suit.

---

1. At the commencement of the trial plaintiff announced in open court that it had never been able to serve Defendant Pat H. Stanford with process and was discontinuing and dismissing its suit as to said defendant. Such discontinuance and dismissal of the suit as to Defendant Stanford is permitted and judgment to that effect and retaxing costs against plaintiff was entered as of January 4, 1968.